[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 208 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 209 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 212 
Upon the trial of this action there was a sharp conflict of testimony, but at the close of all the evidence, the court granted a nonsuit on motion of the defendant and the plaintiff excepted. As was said by the court in Clemence v. City ofAuburn (66 N.Y. 334, 338), "the plaintiff did not assent to any proposition of fact assumed either by the counsel for the defendant or the court, and is not concluded by omitting to request that the whole case or any particular question should have been submitted to the jury. If in any view of the evidence a verdict might have been rendered for the plaintiff, or if there were questions of fact which might have been determined for the plaintiff, and which, if determined in his favor, would have entitled him to recover, the case should not have been taken from the jury." (Sheridan v. Brooklyn City, etc., R.R. Co.,36 N.Y. 39; Colt v. Sixth Ave. R.R. Co., 49 id. 671; Train v.Holland Purchase Ins. Co., 62 id. 598.)
For the purpose of this review, therefore, all questions involving the credibility of witnesses must be resolved in favor of the plaintiff and such facts deemed established as upon any reasonable view of the evidence, the jury could have found in his interest.
The facts, as the jury might have found them had the case been submitted to them for decision, are as follows: On Saturday, July 11, 1885, the plaintiff, who had been the secretary of the defendant ever since its organization, filled out a blank application for insurance upon his own property, intending to present it to the executive committee, which was required by the by-laws of the company to meet in quarterly session on that day. The application was for insurance to the amount of $500 on a wine house and cellar belonging to the plaintiff, *Page 213 
and $1,500 on his personal property kept stored therein, and was in the usual form, except that the custom of the company did not permit personal property to be described by a blanket clause. The application was signed by the plaintiff, who by the last clause thereof, agreed to pay to the defendant the sum of $11 and bound himself to pay it such further sums as should be necessary to meet all legitimate losses and expenses, according to its rules and by-laws. The executive committee, which was at this time composed of Edward E. Russell, George Brown and the plaintiff, by virtue of the offices then held by them, respectively, of president, vice-president and secretary, held no meeting that day, as no one attended, except the plaintiff. Within a day or two the plaintiff met Mr. Brown, and handing him the application, told him that he wished to apply for insurance on his wine house. Mr. Brown took the application in his hands, opened it, looked it through as if reading it and then indorsed his approval thereon as a member of the executive committee, by writing his name in the proper blank space, as the plaintiff had done before him. The plaintiff then went to the office of the company, filled out a policy to himself, according to the application, and signed it as secretary, Mr. Brown having already signed it with others, in blank, as vice-president. At the same time the policy was entered on the "policy register" by Mr. Pratt, as follows, the heads of the columns and the entries beneath being given as if continuous: "Number of policy, 747; name of insured, George L. Pratt; post-office, Ridgeway, Orleans county; date, July 11, 1885; term, three years; amount insured, third class, $2,000; amount of premium, $10; total amount insured, $2,000; total amount of premium, $10." He also charged himself on the ledger with the amount of the premium, $10, and credited himself with $1 as the commission on the same to which he was entitled according to the by-laws. He filed the application with the papers of the company, took the policy home and put it with his other policies, one at least of which was issued by the defendant, but under what circumstances, or by whom signed, did not appear. The first *Page 214 
policy ever issued by the defendant was to the plaintiff on this same wine house and cellar. It was based on an application approved by the plaintiff, Mr. Brown and one Downey, who was president at the time, was written and countersigned by the plaintiff, as secretary, and continued in force for three years, and until it expired by limitation. The next quarterly meeting of the executive committee, after the application in question had been made, was held October 10, 1885, and all of the members were present. According to the testimony of the plaintiff eleven applications, including his own, were presented to and approved by the committee at that meeting, and were so recorded on the minutes of its proceedings, as kept by him. Some of the applications were approved by the indorsement of names thereon, but none in the bundle containing the plaintiff's were so indorsed. Mr. Russell, the president, when requested by the plaintiff to look over those applications, said: "If they have two names on, I wont bother with them. I want to make this next train." The application in question was not otherwise shown to Mr. Russell at that time and he did not examine it, or any other in the package containing it. The applications were always thus presented to the committee "in bulk." In December, 1885, the plaintiff mortgaged the premises insured to one Salisbury and, as secretary of defendant, indorsed its consent thereto, both upon the policy and the application. The premium accompanying the application was paid over, with other moneys, to the treasurer of the company and still constitutes a part of its assets. It does not appear that an annual report was made at the close of the year 1885, except as it may be presumed that the statute was obeyed, nor whether this policy and premium were included in the statement of the affairs of the company as required by law. (L. 1881, ch. 171, p. 217, § 14.) On January 19, 1886, one Chamberlain was elected secretary in the place of the plaintiff, who thereupon delivered all the books and papers of the company, including the application in question, to that officer. In December of the same year the plaintiff called on Mr. Chamberlain to renew a policy *Page 215 
on his dwelling-house then about to expire, and asked him to produce said application on the wine-house and another on his tenant-house, stating that the policies were with Mr. Salisbury and he wished to see when they expired. The application was thereupon produced by the secretary, having thereon in plain sight the consent to the mortgage and the approval of Brown and Pratt only. The annual report for the year 1886, sworn to by the president and secretary, stated that one hundred and ninety-four policies were then in force, one of them being the policy in suit, and that the amount of the outstanding risks was $235,521, which included the risk in question of $2,000. The report also stated the cash on hand, including in the aggregate, but not specifically naming, the premium paid by the plaintiff. The supervisory committee, appointed to examine the books, verify the annual report and certify the facts as found by them, reported that after making a full examination of the books and comparing them with the financial report of the president and secretary, they found that the figures agreed.
On Tuesday, August 2, 1887, more than two years after the date of the policy and eighteen months after the plaintiff had ceased to be secretary, the wine-house, cellar and contents were destroyed by a fire, which occurred at midday. The value of the property burned largely exceeded the amount of insurance thereon. That same afternoon the plaintiff asked Mr. Chamberlain, who was still secretary, to let him see the application, stating that his policy was with Mr. Salisbury and he did not remember the amount of his insurance. Mr. Chamberlain handed him the application and, after it had been examined, took it back. The next day formal notice of the loss was given to the secretary, and two days later the executive committee met the plaintiff, when the president, Mr. Downey, asked him if he had brought his policy. He answered that he had not, as it was in the control of Mr. Salisbury as collateral security to a mortgage. The application was produced and the blanket clause criticised. On being asked if he had made out a list of his loss, plaintiff answered no, and later in the day the president furnished him with blank proofs of loss and requested *Page 216 
him to fill them up that evening, which he did, and delivered them to the secretary the next day. The same day the committee called on him at his house and asked to see his books, and when they were produced, he was informed that they wanted to know what his sales were for the past year, and he said that he would figure it up and let them know. Soon after he took his journal to the committee, gave them the amount of his sales for 1884, 1885 and 1886, and on being told that they wanted to go further back, he went for another journal, but could not find it. He was asked if he could not get at it in some other way, and thereupon spent about an hour in picking the accounts out of his ledger, and as he read them off the secretary took down the amounts. He was told to continue the work with the secretary the next day, which he did for half an hour, when, having found the missing journal, he furnished the rest of the information in five or ten minutes. Soon after he filed with the secretary an additional proof of loss. Each proof of loss comprised many items and both together fill over seven printed pages of the case. During these repeated interviews with the adjusting committee, Mr. Brown, the vice-president, and the director who approved the application, was present, and the committee with full knowledge of all the facts, did not elect to avoid the policy, but in all that they said and did, prior to the commencement of the action, treated it as a subsisting contract, valid in origin and valid at the time of the fire. No offer was ever made to return the premium, although there is no provision for its forfeiture to the company in case the risk never attached or the policy became void.
The main question presented for decision is, assuming that these facts were established, could the jury have found, under proper instructions from the trial court, that there was a valid contract between the parties. The plaintiff could not insure himself in the name of the defendant, and if the supposed contract rested on his action alone, there would be no room for serious controversy. (Neuendorff v. World Mut. Life Ins. Co.,69 N.Y. 389.) But the acts of others, who represented *Page 217 
the defendant only, intervened, and it is claimed that through their action the company waived its right to avoid the policy and ratified it as a good and binding contract. While the plaintiff had a right to fill out his own application, he had no right to approve it, either as a director or as a member of the executive committee, because it is the policy of the law to prevent an agent, entrusted by his principal with the discharge of duties involving the exercise of judgment and discretion, from making a contract, in which he has a personal interest, that may conflict with the interest that he is bound to protect as the agent of another. (N.Y. Central Ins. Co. v. National Protection Ins.Co., 14 N.Y. 85; Voltz v. Blackmar, 64 id. 440; 1 May on Ins. [3d ed.] § 125.) Mr. Brown, however, was under no such disability, but as a director he was empowered to receive, and as a member of the executive committee to approve, the application. His approval and the payment of the premium bound the risk, and, by virtue of the by-laws, the plaintiff was thereby insured until notice to him of the contrary, which was never given. The learned trial judge was inclined to this view, but he held that when the policy was issued, the application had fulfilled its office, and that the insurance from that time depended on the policy and not on the application. But if the policy was void, or if voidable and it was avoided by the company, how could it affect the valid application, which was not dependent upon it? A voidable act, when lawfully declared void, is the same as if it had been voidab initio. Can an act, void in inception or by due declaration, have any legal force? Can a valid contract be merged into a void contract? Can that which does not exist, and is the same as if it never had existed, destroy that which does exist? Moreover, the statute under which the defendant was incorporated, provides that all policies shall be signed by the president and secretary; that the president and secretary shall be directors; that the directors shall be members, and that every person, in order to become a member, must sign an application for insurance. Does not the statute, therefore, contemplate that the secretary shall sign his own policy? *Page 218 
How otherwise can its commands be obeyed, for the secretary is required to sign all policies, and he is also required to take out insurance? But the signing by the secretary would be merely clerical, if the terms of the contract had been previously assented to by other officers of the company, and we refer to the statute simply to show that the policy was not void because signed by the secretary. We think, however, that it was voidable at the election of the company, because its terms had not been previously approved by some officer who represented the company only. Such was the position taken by the defendant when moving for a nonsuit. Therefore, when the executive committee met on October 10, 1885, a valid application, effective as an insurance contract, had been made and a voidable policy issued thereon. The defendant, through Mr. Brown, knew of the former, but is not shown to have known of the latter, except inferentially. If the plaintiff is to be believed, the application was then approved by the executive committee and the temporary insurance thereby rendered permanent. (Fried v. Royal Ins. Co., 50 N.Y. 243;Audubon v. Excelsior Ins. Co., 27 id. 216.)
After the new secretary came in and the application, together with the books containing entries relating to the policy and the premium thereon, were turned over to him, the company had the means of knowing that a policy had been issued. His attention was called directly to the subject some months later when the plaintiff asked him for this application and he produced it. The premium paid by the plaintiff passed through the usual channel into the defendant's treasury, where it still remains. At the close of the year 1886, the officers, of whom plaintiff was not then one, included the policy and its amount in their annual report, not by specific mention, but necessarily counting it to make out the number and amount reported. The supervisory committee, after making a full examination of the books, certified that the report was correct. The books, with their "perfect record of all the transactions of the company," were required by law to be "kept open for the inspection of every member," every *Page 219 
day except Sundays and legal holidays. (L. 1880, ch. 362, p. 541, § 5.)
A year and a half after the plaintiff went out of office, the fire occurred, and the executive committee, after receiving specific notice that a policy had been issued, and that it was in the hands of the mortgagee, met as an adjusting committee. With the open application in their hands, and without a word to indicate that they elected to avoid the policy, they met the plaintiff, asked him to fill out the blank proofs of loss which they gave him, called for his books, required him to furnish information, which they knew involved trouble and loss of time to obtain, and not until the action was commenced, so far as appears, was any step taken to avoid the policy. We think that the evidence permitted the inference that the company, with knowledge of the facts, ratified the policy, and that the effort to avoid it, after suit begun thereon, was wholly ineffectual. (Titus v. Glens Falls Ins. Co., 81 N.Y. 410; Roby v.American Central Ins. Co., 120 id. 510; Hyatt v. Clark,
118 id. 563.)
A question as to the power of defendant's officers to waive or ratify is raised by the defendant, and we are asked to decide it. The argument is made that there is a distinction between stock and mutual companies, because the insured has no voice in the former while he is a part of the insurer in the latter; that each officer is his agent to a limited extent, and cannot waive the obligations of one member to the other, as he is their agent also. The act under which the defendant is organized provides that every person insured shall sign an application for insurance and thereby become a member; that the members shall choose directors, who are to elect the officers, and that the business and corporate powers of the company shall be transacted and exercised by the board of directors, subject to the by-laws; that by-laws may be adopted by the directors, and may provide for an executive committee for such purposes as may be necessary; that the directors may issue policies insuring against damages by fire or lightning. (L. 1880, ch. 362, and L. 1881, ch. 171.) Thus it appears that the defendant *Page 220 
is a corporation, engaged in the business of fire insurance. Its members have no direct power in the management of its affairs. Their power is confined to the election of directors, to whom the business and corporate powers of the company are exclusively confided by law. The relation of a member to the corporation is somewhat analagous to that of a stockholder in a stock company. We see no reason for holding, and we have been referred to no case in this state which holds, that the officers of such a corporation have less power to waive defects or ratify invalid policies than corresponding officers in stock insurance companies.
We have been referred to certain cases in Massachusetts, holding that where the members of a mutual insurance company by formal vote prescribed the form in which their policies should be made, and had thus deliberately determined the liability which they were willing to assume, the officers of the company could not waive such stipulations of the policies and by-laws as constituted the substance and essence of the contract, although they could waive service of proofs of loss and the like. (Evans
v. Trimountain Mut. Fire Ins. Co., 9 Allen, 329; Buffum v.Fayette Mut. Fire Ins. Co., 3 id. 360; Priest v. Citizens'Mut. Fire Ins. Co., Id. 602.)
These cases are not analagous, because the statute under which the defendant exists confers no power upon its members to make by-laws, determine the form of the contract, or do anything except elect directors, who constitute the governing body and wield all the power that the corporation possesses. We think that defendant's officers had the same power with reference to the subjects of waiver and ratification that is possessed by the officers of stock companies. (2 Herman on Estoppel, § 1204 and cases cited.)
The position of the defendant that the policy of the plaintiff, even if once valid, became void on account of the mortgage to Salisbury, requires little attention, because the nonsuit was not moved for on that ground.
If the existence of the mortgage had been made a basis of the motion, non constat, further proof would have been given *Page 221 
upon the subject of consent, and any difficulty in that regard thus avoided. (Isham v. Davidson, 52 N.Y. 237; Adams v.Greenwich Ins. Co., 70 id. 166.) Moreover, the condition in regard to encumbrances affected nothing except the real estate, which was but part of the subject of insurance, and a breach thereof did not affect the remainder of the contract, as it related only to the personal property which was not mortgaged.
Whatever the rule may be elsewhere, it is settled in this state that where insurance is made on different kinds of property, each separately valued, the contract is severable, even if but one premium is paid and the amount insured is the sum total of the valuations. (Merrill v. Agricultural Ins. Co., 73 N.Y. 452;Schuster v. Dutchess Co. Ins. Co., 102 id. 260; Smith v.Home Ins. Co., 14 N.Y. St. Rep. 106; Woodward v. RepublicFire Ins. Co., 32 Hun, 365.)
The claim of the defendant that the plaintiff procured the approval of Mr. Brown and of the executive committee by concealment and fraud, involves a question of fact. We think that the motion to nonsuit should have been denied and the case submitted to the jury, and the judgment should, therefore, be reversed and a new trial granted, with costs to abide event.
All concur.
Judgment reversed.