Bert E. Bockes, Appellant, v. Union Mutual Casualty Company, Appellee.

No. 39446.

April 5, 1929.

Opinion on Rehearing September 26, 1930.

Rehearing Denied May 6, 1931.

Raymond N. Klass, Floyd Philbrick and Rogers & Ruppelt, for appellant.

Harold S. Thomas and J. L. Parrish, for appellee.

GRIMM, J.—On March 27, 1926, the plaintiff filed his petition at law, in Grundy County, Iowa, in two counts, alleging in substance that on December 21, 1921, the defendant and the plaintiff entered into a certain contract of insurance, in evidence of which the defendant issued its certain policy of insurance whereby it insured the plaintiff in the principal sum of $5,000.00, for the term of one year. The plaintiff alleged that on January 3, 1922, the plaintiff slipped and fell under a moving passenger train and, as a result of this accident, he lost both of his feet; that during the months of May or June, 1922, the president of the defendant Company, by a malicious, wanton, and wilful fraud, secured a release of all obligations under said policy of insurance for the sum of $1,000.00, payable at the rate of $100.00 per month, and plaintiff prays for judgment for $4,-000.00, with interest. In the second count the plaintiff prays for $6,000.00 exemplary damages.

On January 20, 1927, the defendant filed an amended and substituted answer in the form of a general denial with specific exceptions. The defendant admitted the execution of the policy and alleged that the plaintiff, in procuring the same, had falsely and fraudulently stated, warranted and represented in his application that he was engaged as an automobile salesman only; that he was insured in two other companies and that the total amount of indemnity provided in said other policies was in the total sum of $80.00 per month; and that the insurance applied for in the defendant company, in itself or in combination with other insurance did not exceed his monthly income. It is alleged that these statements were untrue and fraudulently made and that the policy would not have been issued to him had he not made these false and fraudulent representations to the Company.

It is also alleged that in addition to being an automobile salesman, the plaintiff is a professional wrestler. It is alleged that the contract of insurance provided, in substance, that the right to recover under any policy which might be issued on the basis of his application for insurance should be *barred* in the event that any one of the statements contained in said application, material either to the acceptance of the risk or the hazard assumed by the Company, is false and made with the intention to deceive, and that by said agreement it was stipulated that the

statements contained in said application were material both to the acceptance of the risk upon the part of the Company in the issuing of the policy and of the hazard assumed thereby.

It is alleged that reports were made in reference to the accident, and thereafter a dispute arose as to the liability of the defendant Company, which dispute was settled and compromised by an agreement to pay and the payment of $1,000.00.

It is also alleged in the amended and substituted answer that at no time did the plaintiff ever earn the sum of $280.00 per month, which is the total amount of indemnity provided in the three policies of accident insurance. It is alleged that the second of the three policies was secured on the 13th day of December, 1921, and the policy in question on the 14th day of December, 1921; that some time prior to the 14th of December 1921, and continuing to said date, the plaintiff became badly involved in financial difficulties by reason of the fact that he had issued worthless checks, for which he had no money to pay, to many and various people in Grundy County; and that he had no ways or means to earn enough to pay said obligations and was not earning sufficient salary or wages to satisfy same; that he was being threatened with criminal prosecution for the issuance of said checks, and thereupon the plaintiff evolved the idea of insuring himself, with the intention, to in some way or manner, suffer an accident whereby he could secure indemnity from said insurance companies and thus retire said obligations and, in keeping with said plan and procedure, this plaintiff on the night of January 3, 1922, voluntarily exposed himself to the risks and dangers of an accident; not the one he eventually received, but said defendant alleges that the said plaintiff went behind said train at the time of said accident, with the purpose and intention of voluntarily exposing himself to an injury, fully intending, without the notice or knowledge of said insurance companies, to claim indemnity, thereby securing funds for the purpose of retiring his obligations.

We now quote some of the material parts of the contract. First, from the application:

"I hereby apply for insurance in the Union Mutual Casualty Company, Des Moines, Iowa, based upon the following representations:

"5. (a) What is your occupation? Auto salesman.

"9. Have you any insurance against accident or sickness in other companies, associations, societies or lodges (Name Company), amount and monthly indemnity). Bankers, Des Moines and Mutual Benefit, $80.00 mo.

"11. Does the insurance hereby applied by itself or in combination with other valid insurance on the same risk or otherwise applied for and not issued exceed your monthly wages, salary or income? No.

"20. Do you understand and agree that the right to recover under any policy which may be issued on the basis of this application shall be barred in the event that any one of the foregoing statements material either to the acceptance of the risk or the hazard assumed by the Company is false, and made with the intent to deceive, and do you further agree that this application shall not be binding upon the Company until accepted by the Company or by an agent duly authorized to issue policies and that the policy will not be in force until all policy fees or premiums are paid and that the maximum contingent liability of the policy holder hereunder shall be in an amount equal to the premium paid for the term for which this policy is written? Yes.

"21. Do you agree to accept the policy subject to all of its provisions, conditions, and limitations and to pay the premium required on or before date due? Yes."

The plaintiff filed a long reply in ten divisions, alleging, among other things, that a copy of the plaintiff's application for the policy was not attached to the policy when delivered to the plaintiff.

The policy provided among other things as follows: That it is issued "In Consideration of the statements and agreements contained in the application herefor (a copy of which is endorsed hereon and made a part hereof); * * *"

It appears from the record that the plaintiff at the time of the trial, December, 1927, was 37 years of age and unmarried. He testifies that on December 21, 1921, he gave his application for the insurance in question to an acquaintance, one Brownell, then living at Eldora; that he did not read the application before signing it. He testifies that he went to the country school

until he was 17; after leaving school he farmed a part of the time, working for his father and also for himself. He spent about a year in the service, returning in April, 1919, which year he farmed for himself. He states that he wrestled for money occasionally throughout the country; that in 1921 he sold automobiles and also sold tires and accessories, on the road. When asked in reference to his purpose in taking out this particular insurance, the record shows the following:

"Q. Just what was your reason for taking out this accident policy at that time, Bert?

"A. General protection.

"Q. Had you in mind any special trips?

"A. Oh I had thought maybe I would go to Dakota sometime after the holidays or nearer Spring, or South Dakota."

At that time he was selling automobiles for a concern in Conrad, and also dealt in second hand cars.

The plaintiff's own narrative as to how the accident happened is as follows:

"I was in Grundy Center on or about January 3, 1922. I was at the Rock Island depot about nine, nine-thirty, or ten o'clock that night in Grundy Center and was buying a ticket to Reinbeck and on that occasion and at that time I suffered some injuries. I lost both my feet. The circumstances of that injury and how it happened are that on New Year's day at dinner I had eaten something that did not agree with my stomach. I hated to start out because of the diarrhoea which had been going on for a couple of days. I was in talking with the boys. There was some man from Waterloo as I recall it, I don't remember his name, waiting for the train. I had already bought a ticket and went out,—there was quite a few in there, and I got cramps in the stomach, and felt as if I had to go somewhere for relief and lots of times these toilets are unsanitary or locked and I did not have time to examine them, and went across the railroad track of the loading platform and before I got back the train had pulled in. I came around from behind the platform. I was running fast as I thought I had to hurry and went over the first tracks or somewhere along there and I slipped and fell and that is all I remember of. I don't think I was running either to the

east or to the west. I don't think I had turned very much either way. I intended to go west. I think I headed over off straight south at the time I fell.''

The plaintiff was taken to a hospital and on the 14th of February following he was moved to his father's home on the farm. In April, the plaintiff made a trip to Chicago in connection with the purchase of artificial limbs.

The notices required by the contract were made out in whole or in part by the plaintiff himself and forwarded to the Company. It appears that the last of these notices was on April 7th. From the time these notices were made to May 9, 1922, no one from the defendant Company saw the plaintiff, except Mr. Brownell and, as the plaintiff says, he had nothing to do with the settlement of the claim. The plaintiff further says: ''between the date of my injury and May 9, the day of settlement, no one had been there to see me about the claim.'' On May 9, 1922, one William Schulz, the president of the defendant Company, telephoned the plaintiff, who was then living with his father on the farm. When Schulz telephoned the first time, the plaintiff was out. Afterwards, on reaching the plaintiff, by telephone, Schulz asked the plaintiff to come to Conrad. On being advised that he had no way to get to Conrad and also that the representatives of the other companies had come out to the farm to see him, Schulz agreed to come out and did so. The entire conversation between Schulz and the plaintiff at the home of the plaintiff's father, with whom the plaintiff was then living, was in the presence and hearing of a brother of the plaintiff, Clarence Bockes.

The record contains a long recital of the alleged conversation between Schulz and the plaintiff in the presence of the plaintiff's brother. The substance of the material parts thereof is that Schulz, on behalf of the defendant Company, was claiming the Company was not liable on the policy for various reasons, among others that, as the plaintiff put it, ''I was over-insured.'' The defendant Company, through Schulz, was contending that the original application contained a material false representation in reference to the amount of the indemnity provided for in the other policies, together with the total amount of indemnity provided for in the three policies, and that the said total amount of

indemnity far exceeded the earnings or wages of the plaintiff. Plaintiff, in direct examination, testified on the subject as follows:

"He told me several times that he felt sorry for me and then went ahead and said I was over-insured and due to that fact that I did not have a claim. He said I was over-insured on account of the other policies. That I had been getting more on the monthly plan than I was earning as I understood it. I understood him to mean by over-insurance I had more monthly or weekly indemnity than my wages or earnings."

"He said if I sued them I would not get anything. He said he would rather give it to me than to the Lawyers. He said it would probably cost that much to defend the trial. That was practically all the conversation. I have related here substantially the meat of the conversation and discussion that took place."

The plaintiff was further asked this question by his counsel:

"Q. Bert, I will ask you whether or not Mr. Schulz stated to you how much, if anything, the Company would be forced to pay you if you sued them and did not accept the settlement?

"A. No he did not tell me what I could recover. I believed what he told me and because of that I made this settlement."

On cross examination the plaintiff said:

"In the course of the conversation he told me there was no liability on the part of the Company. He stressed that very strongly and his reasons for saying that, as he told me, was that the amount of my weekly indemnity on these three policies was in excess of my income.

"Q. And the only representation that he made to you that you can remember, which he claimed had invalidated the policies, was the one that your income wasn't equal to the aggregate amount of indemnities upon the three policies or that in substance?

"A. Well he said I was over-insured.

"Q. That is what you understood him to mean when he said you were over-insured, as you stated yesterday? You didn't understand him to mean that you were over-insured in the sense

of the indemnity clause that applied in case you lost both legs? You say he didn't make claim you were over-insured in that respect?

"A. No it was the weekly or monthly indemnity."

It appears that as a result of this conversation there was a valid agreement entered into between the parties, by the terms of which the contested claim of the plaintiff against the defendant was to be settled for the sum of $1,000.00 to be paid in monthly installments of $100.00 each. The conversation at the home lasted about one and one-half hours. The parties then went from the farm house to Conrad, where they went into the State Bank. The trip from the farm to Conrad was made with the man who brought Schulz to the farm. On arrival at the bank in Conrad two written instruments were prepared,—first, a proposition of settlement signed and executed by Bockes, and second, a formal receipt and release in words and figures as follows:

"Agreement
"Conrad, Iowa, May 9, 1922.

"It is agreed by and between Bert E. Bockes of Conrad, Iowa and the Union Mutual Casualty Company of Des Moines, Iowa, as follows: In consideration of a full release to the company by Bert Bockes of all liability of whatever sort accrued or to hereafter accrue as the result of the accidental loss of both feet, on January 3, 1922, said company agrees to pay one thousand dollars as follows: Twenty-five dollars on May 9th, receipt of which is hereby acknowledged, Seventy-five dollars on June 1, following the date of this agreement and one hundred dollars on the first of each month thereafter until the total of all payments equals one thousand dollars.

"In the event of default in payment by the company of any installment on a date not later than the 10th of any month when such payment becomes due the unpaid balance of the amount due unto this agreement shall immediately become due and payable at the option of Bert E. Bockes.

"This agreement shall be the property of Bert E. Bockes and if assigned or disposed of by any other means shall be binding

upon the company until the full amount of one thousand dollars has been paid.

(Signed)   "Bert E. Bockes
"The Union Mutual Casualty Co.
"By Wm. Schulz,
"President, General Manager."

This instrument appears to have been sworn to before a notary public on May 9, 1922.  On June 24, 1922, plaintiff assigned the instrument to the Farmers Savings Bank of Holland, Iowa, who afterwards acknowledged full payment thereof.  The assignment to the bank was sworn to.

The plaintiff testified in reference to payments as follows:

"As I left he gave me $25.00, it was by check.  I think his personal check, but I might be wrong in this.  The next payment was $75.00 and the rest of them $100 each month."

After the settlement was consummated, the plaintiff made application to the defendant Company for a position with it as a sales agent.  He testified he had offers from other companies.  The plaintiff continued to write insurance as an agent for the defendant company for a period of about two years, during which he admits that he frequently told different parties "that the company had made a fair settlement with me and I thought at that time that I had a fair settlement."  The plaintiff further states:  "The first time that any question regarding the propriety of this settlement arose in my mind was on reading the Dayton case of Eldora.  It was about two years ago that I read about the Dayton case."

It will be noted that this suit was started three years and nine months after the date of settlement.

I.  The appellant filed an amendment to the abstract in this case on the 2d of December, 1929, after the petition for rehearing had been granted.  A motion was filed to strike this amendment, which motion was marked "overruled," and afterwards so entered upon the records.  The motion might properly have been sustained, but whether so sustained or overruled is wholly immaterial to a determination of the case; for, under the long, unbroken line of cases of this court, such an amendment cannot be considered on this appeal.  See Simplot v. Dubuque,

49 Iowa 630; McDermott v. Railway Company, 85 Iowa 180; Iowa City v. Johnson County, 99 Iowa 513; Martin v. Martin, 125 Iowa 73.

**II.** It is strenuously contended by the appellant that the record does not disclose that a copy of the application made by the plaintiff to the defendant was attached to the policy. On this theory it is argued that the defendant company was not in a position to take advantage of any misstatement or misrepresentation contained in said application. This has special reference to the provisions of the application hereinbefore quoted pertaining to the weekly indemnity provisions of the three accident policies and the earnings or wages of the plaintiff. The statutory provision (Section 1741, Code of Iowa, 1897) pertaining thereto is as follows:

"All insurance companies or associations shall, upon the issue or renewal of any policy, attach to such policy, or indorse thereon, a true copy of any application or representation of the assured which, by the terms of such policy, are made a part thereof, or of the contract of insurance, or referred to therein, or which may in any manner affect the validity of such policy. The omission so to do shall not render the policy invalid, but if any company or association neglects to comply with the requirements of this section it shall forever be precluded from pleading, alleging or proving any such application or representations, or any part thereof, or falsity thereof, or any parts thereof, *in any action upon such policy*, and the plaintiff in any such action shall not be required, in order to recover against such company or association, either to plead or prove such application or representation, but may do so at his option." (Writer's italics.)

All that the record contains on the question whether the application was attached to the policy is found in the plaintiff's own testimony, which is as follows:

"The policy was later delivered to me but I did not read the policy over nor the copy of the application with the policy."

The original policy was not before the trial court. It appears some order was made in relation to producing it or a copy, and a blank policy form was presented and introduced. It was described by the witness who presented it as a "specimen policy

containing the same form and provision as the policy issued to Bert E. Bockes.'' There was no attempt at presenting an accurate copy of the policy as finally delivered to the plaintiff.

Without further enlarging upon this phase of the case, we may say there is no evidence in the record to support a finding, that a copy of the application made by the plaintiff was not attached to the policy at the time the same was delivered by the defendant Company to the plaintiff. On the contrary, the only fair and reasonable inference to be drawn from the record is that a copy of the application, as made by the plaintiff, was attached to the policy at the time it was delivered to him. Moreover, it will be borne in mind in this connection that this is not a suit on the policy, as specified in the statute hereinbefore quoted; it is a suit based on fraud. Furthermore, it is the plaintiff who is contending, as a part of his case, that the defendant was in no position to take advantage of the misrepresentations of the plaintiff made in his application for insurance with the defendant Company, because, as the plaintiff claims, a copy of the application was not attached to or endorsed upon the policy. Manifestly, therefore, the burden of proving that the application was not endorsed upon or attached to the policy was upon the plaintiff, and this burden the plaintiff failed to successfully carry. So far as this record is concerned, a copy of the application was attached to the policy.

Manifestly, if the suit were upon the policy and the defendant company sought to defend upon provisions contained in the application, the defendant would carry the burden to prove that a copy of the application was attached to or endorsed on the policy when the policy was issued.

III. It is one of the elements of the plaintiff's claim that the settlement was procured by a false and fraudulent representation on the part of the president of the defendant Company (Schulz) to the plaintiff, that the aggregate of the indemnity provided for in the three policies exceeded the earnings or income of the plaintiff. The record discloses that these indemnities amount to $280 per month. In order to prove that the statement made by Schulz to the plaintiff was false, the burden was upon the plaintiff to show that he, the plaintiff, was earning during the time in controversy $280 or more per month. This burden also the plaintiff failed to successfully carry, and, so far

as this record is concerned, it appears conclusively that there was a misrepresentation in the application, and it appears conclusively that, as the plaintiff put it, he was over-insured; that is to say, the amount of the indemnity provided for in the three policies was in excess of the earnings of the plaintiff per month. The net result of all this is that the record conclusively shows that Schulz was correct when he said, in substance, that the plaintiff was over-insured, and it was the contention of Schulz at that time, by reason thereof, that there was no liability, on the part of the defendant, to the plaintiff, on the policy in controversy.

It will be recalled that the application in paragraph 9 stated the amount of the monthly indemnities from the ''Bankers, Des Moines & Mutual Benefit'' was $80.00 a month, when, as a matter of fact, it conclusively appears it was $280.00 per month. The application, therefore, contained a false statement in that regard, a statement which must have been known to the plaintiff to have been false when it was inserted in the application.

It must also be borne in mind that paragraph 11 of the application provided as follows: ''Does the insurance hereby applied by itself or in combination with other valid insurance on the same risk or otherwise applied for and not issued exceed your monthly wages, salary or income? A. No.'' Here again the plaintiff made a false representation to the defendant Company and one which must have been known to the plaintiff to have been false at the time he made it.

It will here be recalled that the contract provision on the subject, as found in the application, is as follows: ''Do you understand and agree that the right to recover under any policy which may be issued on the basis of your application shall be barred in the event that any one of the foregoing statements, material either to the acceptance of the risk or the aforesaid, assumed by the company is false, and made with the intent to deceive: * * *? A. Yes.''

It must be recalled that at the time the plaintiff was testifying in this case, he had been in the insurance business for a considerable period of time and had become familiar, more or less, with insurance terms as they are ordinarily used by the layman. It was on that account he was continually referring to ''over-insurance,'' but it clearly appears from the record that he fully understood, at the time Schulz was talking to him, what

Schulz meant, to wit: That the plaintiff had made false representations in his application to the defendant Company in that, first, he had misrepresented the amount of the indemnities provided for in the other two policies, and, second, he had misrepresented in his application that the total provided for in the indemnities in the three policies did not exceed his income.

As previously stated, as the plaintiff charged that Schulz, in his conversation with the plaintiff at plaintiff's home in connection with the settlement, claimed that the policy in controversy contained this over-insurance and that said statements were false, it was incumbent upon the plaintiff to prove, as a part of his case in support of his claim of fraud, that the plaintiff. actually was, during the time in controversy, receiving a salary equal to or in excess of the amount of the indemnities provided for in the three policies. This he failed to do.

IV. From an examination of the application and the policy issued thereon, it clearly appears that the contract provides for indemnity. It is to be in different amounts depending upon the injury received, as, for instance, loss of life, loss of limb, loss of sight, loss of time, loss of time by accidental means, loss of time by sickness. Definite specific rates of indemnity are provided for each particular accident which may be sustained by the policy holder. For loss of time, depending upon the circumstances, the indemnity is at a specific rate for a specific period of time, and for loss of an eye or both eyes, or a foot or both feet, and for all similar losses covered by the policy, there is provided a specific definite indemnity.

The application is the basis for the issuance of the policy and is a part thereof. In this application the plaintiff definitely agreed that ''the right to recover under any policy which may be issued on the basis of this application shall be barred in the event that any one of the foregoing statements (statements made in the application) material either to the *acceptance of the risk* or the *hazard assumed by the company* is false and is made with intent to deceive.'' (Writer's italics). This is plain, unambiguous language which the parties had a right to insert in a contract entered into between them. The president of the defendant Company had a right to assume that the language would be construed in accordance with its ordinary and usual meaning. The president knew, as did the plaintiff, that there were false state-

ments contained in the application, which were material, either to the acceptance of the risk, or to the hazard assumed by the Company, or to both, and, therefore, we think the president was justified in assuming and believing that the Company had a good defense to the policy, and that he was warranted in so stating to the plaintiff at the time of the settlement.

At all events, the plaintiff cannot here recover, nor is he entitled to go to the jury with the case unless he has at least made a prima facie case, showing that Schulz made a statement or statements of material facts as differentiated from mere expressions of opinion, which statements were false and known by Schulz to have been false at the time they were made, or that they were statements which Schulz had no reason to believe were true, that such statements were made for the purpose of inducing the plaintiff to believe and rely upon them, that the plaintiff did rely upon them, and that he was damaged thereby.

The burden was on the plaintiff from the beginning to the end of such proof. The record is silent of any showing that Schulz made any statements to the plaintiff, which he, Schulz, knew were false at the time they were made. On the other hand, while we are not here determining the Company's defense to a suit on the policy, if one had been brought, it clearly appears that Schulz was warranted in believing that the Company had a good defense to an action which might be brought upon the policy, by reason of the terms of the application and the policy and the false statements contained in the application as made by the plaintiff. Further discussion seems unnecessary.

In order to sustain the holding of the lower court, it is not necessary for us to here find that, in an action on the policy by the plaintiff, the defendant must necessarily recover. It is incumbent upon the plaintiff to show that Schulz representing the Company, fraudulently made false statements to the plaintiff, knowing them to be false at the time they were made, and that such statements were made for the purpose of fraudulently deceiving the plaintiff into a settlement. This burden the plaintiff has not successfully carried. There is here no proof that any of the statements made by Schulz were not his opinions as expressed by him at the time. Johnson v. C. R. I. & P. Ry. Co., 107 Iowa 1. On the question of "over insurance" the plaintiff knew all the facts and could not have been misled. Had the

plaintiff brought a suit on the contract, an entirely different case would have been before us, but upon this case of alleged fraud we must find that the plaintiff has failed to make out a prima facie case, and therefore, the holding of the lower court must be and is—Affirmed.

EVANS, STEVENS, FAVILLE, ALBERT, KINDIG, WAGNER, JJ., and MORLING, C. J., concur.

DE GRAFF, J. (dissenting).—I respectfully dissent from the conclusion announced in the majority opinion and shall state my view of the facts and the law applicable thereto.

My contention is that a fact question was presented and that the case was one for the jury and not for the trial court to determine. My thesis in this case may be briefly stated as follows: Where an accident policy provides (1) for $5000 for loss of life or limb (2 legs) (with a specific provision that in such event no monthly indemnity is payable—the instant case), (2) for monthly indemnity for loss of time where there is no specific loss of life or limb.

(A) That the policy contains two separate and distinct contracts of insurance, viz: (a) against loss of life or limb, (b) against loss of time. That the statements and the question of earnings in the application affect, refer to and are material only to those injuries involving monthly indemnity payments.

(B) That the matter of earnings of the insured has absolutely no bearing, relevancy, or materiality on the matter of loss of life or limb.

The instant action is to recover damages on the ground of fraud and deceit in effecting a settlement under an accident insurance policy. It appears that on January 3, 1922, at Grundy Center, Iowa, the plaintiff-appellant slipped and fell under a railway passenger train which crushed his legs necessitating the amputation of both feet above the ankle joints. The plaintiff in his petition alleges that on December 21, 1921, the defendant insurance company and the plaintiff entered into a certain contract of insurance whereby it insured the plaintiff in the principal sum of $5000 in the event of the loss, by accidental means, of his two feet at or above the ankle joints; that on January 3, 1922, he slipped and fell under a railway train and as a result of the accident lost both of his feet; that during the month of

May or June, 1922, the President of the insurance company, by wanton and willful fraud, secured a settlement and a release of all obligations under said policy for the sum of $1000 payable at the rate of $100 per month. Plaintiff prays judgment in the sum of $4000 and interest. The defendant filed an amended and substituted answer by way of a general denial with specific exceptions and admissions. The defendant admitted the execution of the policy and alleged that plaintiff in procuring same falsely represented in his application that he was insured in two other companies and that the total amount of indemnity provided for in said other policies was in the total sum of $80 per month; that the insurance applied for in the different companies in itself or in combination with the other insurance carried did not exceed his monthly income. It is alleged that these statements were untrue and fraudulently made and that the policy would not have been issued to the plaintiff, had he not made these false representations to the defendant company. Other allegations are contained in defendant's answer, but they are not material in the disposition of this appeal.

It is clearly shown by the application attached to the policy in question that the plaintiff Bockes applied for three kinds of insurance, all to be included in a standard form of policy, to wit (1) accidental death, (2) accident indemnity and (3) sickness indemnity, and that the premium for each kind was to be paid in a single named amount. The policy which was issued to him by the defendant company distinctly and without ambiguity states at the head thereof that it "provides indemnity for loss of Life, Limb, Sight, or Time" and in the "insuring clause" it provides for "Loss of Time through disability from sickness." It is also obvious that the company in writing the policy has, under the heading "Specific Total Losses" and "Monthly Indemnity," made a separation and distinction between loss of Life, Limb and Sight and *Loss of Time* by reason of injury or sickness and specifically states under the "Partial Disability" Clause (b) under Section II, *That no payments of monthly indemnity shall be made in case of any loss enumerated in Section I,* that is for death, dismemberment or loss of sight. The policy issued to the plaintiff by the defendant company, by its provisions, granted insurance as follows:

A. For accidental loss of life, limb or sight and for which a

stipulated amount, called, "Principal Sum" was to be paid or a stipulated part thereof, depending upon the nature of the loss of limb or sight.

B. For loss of time on account of disability caused by accident or sickness and for which a monthly indemnity was to be paid, depending upon the duration of such disability. Section I applies solely to loss of life, limb or sight and recites without reservation that the company will pay In Lieu of All Other Indemnity the Principal Sum, and under Section II which applies solely to loss of time recites specifically that No Payments of Monthly Indemnity Shall be Made for Any Loss Enumerated Under Section I. This is a standard form policy and provision 19 of the "Standard Provisions" in said policy provides:

19. "If a like policy or policies, previously issued by the company to the insured be in force concurrently herewith, making the aggregate indemnity for loss other than that of time on account of disability in excess of $15,000, or the aggregate indemnity for loss of time on account of disability in excess of $100 weekly, the excess insurance of either kind shall be void and all premiums paid for such excess shall be returned to the insured."

It is quite obvious that the defendant company recognized the separation and distinction between the insurance granted for loss of life, limb, or sight and for loss of time, and the policy uses the expression "either kind" in connection therewith. The insurances in said policy are clearly separable and are so held to be by a uniform line of decisions. It is said in Employers' Liability Assur. Corp. v. Morrow, 143 Fed. 750 (C. C. A. 6th Dist.) (Tenn.) in speaking of a policy similar to the one in the instant case:

"But no right to receive any weekly indemnity whatever exists for the loss of an arm. * * * In that event, the express * * * covenant is to pay the assured the sum of Ten Thousand Dollars. * * * Neither is there any analogy between the loss by fire of specific property and the loss by accident of an arm or other limb. In the first case, property has a market value, and when that market value is paid the assured is indemnified. A bodily injury has no market price. If it results in a mere disability to

continue the assured's avocation, the value of the assured's time during such disability furnishes a definite standard for a contract of indemnification. * * * But the contract recognizes that for a death by accident, or the loss of limbs, or an eye, there is no market standard of value and accordingly provides in most explicit terms for the payment of an agreed sum to be paid in full discharge of the liability under the policy.''

The foregoing statement of legal principle was adopted and approved by this court in Wahl v. Inter-State B. M. Acc. Assn., 201 Iowa 1355. Therein we said: " '[Life insurance] in no way resembles a contract of indemnity. * * * it really is what it is on the face of it, a contract to pay a certain sum in the event of death.' '' It is manifest that the policy issued to Bockes was an instrument containing at least two separable and distinct contracts of insurance, neither having anything to do with or depending upon the other. In other words, if the insured suffered the loss of two legs, or other ''principal sum'' injury, there was to be no monthly indemnity payable and if he suffered disability and loss of time there was to be no ''principal sum'' payment. The situation was exactly the same as if the defendant company had issued two separate and distinct policies, one insuring against loss of life, limb and sight, and the other insuring against loss of time. This situation is in no way changed because only one application and one policy was used. Things equal to the same thing are equal to each other. When the clauses in a policy are clearly separable, effect must be given in conformity therewith. If the risk as to one class would not affect the risk on the other class or classes, although the policy may be void as to one class, it would not be void as to the other class. Taylor v. Anchor Mut. Fire Ins. Co., 116 Iowa 625; General Acc. & Life Assur. Corp. v. Meredith, 132 S. W. 191 (Ky.); Aetna Life Ins. Co. v. Bethel, 131 S. W. 523 (Ky.); Trabue v. Dwelling House Ins. Co., 25 S. W. 848 (Mo.), 23 L. R. A. 719; Pratt v. Dwelling House Ins. Co., 130 N. Y. 206.

The plaintiff-appellant testified that from the time the proof of loss was prepared and sent until May 9, 1922, no one from the appellee company had seen him with regard to the matter of his claim. He also testified that on May 9, 1922, William Schulz, of Des Moines, President of the appellee company, visited him at

his father's farm near Conrad, Iowa, and in the presence of appellant's brother, Clarence, who, it was stipulated by counsel, would testify in respect to the conversation between appellant and Schulz, substantially the same as testified by the appellant, which conversation was that Schulz said that he felt sorry for the appellant as it seemed too bad to see anyone crippled as he was; that the company did not owe appellant anything under the policy; that appellant was over-insured and due to that fact the appellant had no claim; that appellant had been getting more on the monthly plan than he was earning; that appellant was over-insured on account of the other policies; that Schulz did not tell them that there was no indemnity payable when he lost two legs; that Schulz finally agreed to give appellant $800 in cash or $1000 on the installment plan; that Schulz advised the appellant to accept the settlement offered him; that Schulz said appellant had better take that or he would not get anything out of it; that appellant did not have any legal rights; that if appellant sued he would not get anything; that he (Schulz) would rather give it to appellant than to give it to the lawyers; that it would probably cost that much to defend a trial; that as to the outcome of any litigation, appellant would not get anything; that there is no liability on the part of the company on appellant's contract, and that the reason for his saying that was that the appellant's weekly indemnity on the three policies was in excess of appellant's earnings.

On cross-examination appellant was asked and made answer to the following questions:

"Q. And the only representations that he made to you that you can remember, which he claimed had invalidated the policies, was the one that your income wasn't equal to the aggregate amount of the indemnities upon the three policies, or that in substance?

"A. Well he said I was over-insured.

"Q. That is what you understood him to mean when he said that you were over-insured, as you stated yesterday, you didn't understand him to mean that you were over-insured in the sense of the indemnity clause that applied in case you lost both legs. You say that you don't make claim you were over-insured in that respect?

"A. No, it was the weekly or monthly indemnity.

With respect to the making of the application for the insurance the plaintiff testified that he was acquainted with Brownell and was in the month of December, 1921; that Brownell solicited the policy and that he purchased a policy from him; that he gave Brownell an application in Eldora, Iowa, on or about December 21, 1921; that Brownell asked him some questions and that he (Bockes) answered them; that he answered them truthfully; that he recalled that Brownell asked him as to other insurance that he had and that he told him the companies and told him how much the principal sum of the other policy was and also the weekly and monthly indemnity; that he did not read the application before signing it because he thought that Brownell knew more about it than he did; that he had never done any insurance business and knew nothing about it; that he relied upon Brownell to fill out the application correctly.

An applicant is justified in relying upon the advice and the assistance of an agent in preparing the application and the language will be given a reasonable construction in favor of the insured in order to avoid forfeiture on technical grounds. Bucknam v. Inter State Bus. Men's Acc. Assn., 183 Iowa 652. Brownell as a witness testified that he was the agent of the defendant insurance company on Dec. 21, 1921, and on or about that time received the application from Bockes for a policy of accident insurance in the defendant company; that at the time he received the application he knew that Bockes did some wrestling and from the time he received the application until May 9, 1921, the date of the settlement no one for or representing the defendant company asked him what had been told him by Bockes, or what he knew of or about Bockes at the time the application was accepted. Schulz, the President of the Company, testified he was the President and the directing head of that institution and was familiar with all the operations and methods of the Company; that he saw the original policy but did not have it with him upon the trial; that the defendant company was organized and began to write business in September 1920; that prior to that time he was with the Bankers Accident and had been in the insurance business about 20 years; that he settled claims for the Bankers

Accident and was familiar with the operation of the pro-rata clause.

The appellant Bockes had received no advice respecting his claim from anyone, and there was nothing to aid him beyond the statements made to him by Schulz. It is further shown that Schulz, after the conversation with Bockes on the farm, went to a Conrad bank, selected by Schulz and at that place Schulz prepared two instruments. One of these bore the caption "Proposition for Advanced Settlement." Bockes had nothing to do with the drafting of that document and signed it when requested so to do by Schulz. This document was addressed to the insurance company at Des Moines and stated that for the purpose of making settlement in advance of all claims accruing at any time under the said policy on account of accidental injuries sustained by Bockes on or about January 3, 1922, that Bockes offered to accept the sum of $1000 in full payment and discharge of all claims of every kind, nature, or description, binding Bockes, his estate, heirs, assigns and beneficiaries. From the very nature of the document the jury could well find that there was a purpose in preparing such an instrument for Bockes to sign. Immediately thereafter, another instrument constituting a full release to the company of all liability from whatever source that had accrued or thereafter to accrue as the result of accidental loss of both feet on January 3, 1922, was prepared by Schulz which Bockes signed upon request. These writings made it appear that Bockes made the offer to accept $1000 before the insurance company, by its President Schulz, agreed to pay him the amount stipulated in said writings. The jury might well find, under all circumstances, that the procedure taken was a part of a scheme to defraud. A compromise settlement induced by fraud is no different than any other settlement so induced. Pertinent language is used in the case First Nat. Bank v. Hartsock, 202 Iowa 603:

"Fraud is not committed openly. It is an offense of secrecy. Direct evidence is rarely obtainable. Frequently it can be shown only by the circumstances admitted by the parties to it. * * * The circumstances of a *bona fide* transaction are ordinarily consistent with each other, and with generally recognized business methods and fair dealing, and not incredible. A fraudulent transaction naturally begets stilted, contradictory, and in-

credible evidence. The bona-fide transaction and the fraudulent one each has its well recognized indicia. * * * 'The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than most direct testimony.' ''

The record shows that the appellant was insured, at the time he applied for insurance in the appellee company, as follows:

|  | Principal Sum | Monthly Indemnity |
|---|---|---|
| Mutual Benefit | $2000 | $ 80 |
| Bankers Accident | 1000 | 100 |

and which in combination with the insurance applied for in the defendant Company made the total insurance as follows:

| Principal Sum | Monthly Indemnity |
|---|---|
| $8000 | $280 |

No evidence whatever was produced on the trial of this cause showing what the *wages, salary or income* of appellant was at the time of the making of the application for insurance in the appellee company. The appellant, however, testified that he had been asked the questions by Brownell, the agent, and that he had answered them *truthfully*.

It appears that the denial of liability on the policy for the loss was based by appellee upon the answer to questions 9, 11 and 20 of the appellant's application. As heretofore pointed out, the insurance applied for was of three kinds, (1) accidental death, (2) accident indemnity, and (3) sickness indemnity. The applicant was asked these questions by the agent and the latter wrote the answers as they appear in the application. The questions and answers as they appear are:

''(9): Have you any insurance against accident or sickness in other Companies, Associations, Societies, or lodges? (Name company, amount, and monthly indemnity.) Bankers Accident and Mutual Benefit $80. No.

''(11): Does the insurance hereby applied for by itself or in combination with other valid insurance on the same risk or otherwise applied for and not issued, exceed your monthly wages, salary or income? No.

"(20): Do you understand and agree that the right to recover under any policy which may be issued on the basis of this application shall be barred in the event that any one of the foregoing statements material either to the acceptance of the risk or the hazard assumed by the company is false, and made with the intent to deceive, and do you further agree that this application shall not be binding upon the Company until accepted by the Company or by an agent duly authorized to issue policies and that the policy will not be in force until all policy fees or premiums are paid and that the maximum contingent liability of the policyholder hereunder shall be in an amount equal to the premium paid for the term for which this policy is written? Yes."

The appellant testified that he recalled Brownell's asking him about the other insurance that he carried and that he told Brownell how much principal sum of the other policy was and also the weekly and monthly indemnity he had. The question in the printed form required that the name of the Company, the amount and the monthly indemnity be given. The answer as it stands is totally lacking as to the requirements. The fact that the appellee company accepted the answer as it stood and issued to the appellant its policy, that answer being a part of the consideration for the contract, without seeking further enlightenment as to the facts called for by the question, cannot now be repudiated and made a basis for a claim without evidence that the appellant did not *truthfully* answer the question. It was within the power of the appellee company to refuse to issue a policy on the application until the appellant had stated that he had insurance as follows:

| Company | Amount of Principal Sum | Amount of Accident | Monthly Indemnity Sickness |
|---|---|---|---|
| | $............ | $............ | $............ |

The company did not do so, but accepted the answer as an answer when it was far from being an answer as required by the question. It appeared not to be material to the appellee company what amount the appellant carried as "principal sum" (death and dismemberment) insurance. It was not even hinted at in the answer to question 9. The acceptance of an application by an insurance company with an unanswered question or

one insufficiently answered without requiring further information thereon estops the company to set up the lack of such information and the insured's failure to fully answer the question as a defense to any claim wherein the unanswered or insufficiently answered question is material. Fountain v. Standard Fire Ins. Co., 155 Iowa 96; Collins v. Iowa Mfgrs. Ins. Co., 184 Iowa 747. The very fact that the appellee company accepted the application with question 9 unanswered as to the amount of principal sum insurance carried is particularly persuasive and conclusive that it was not interested in the amount thereof as affecting the particular hazard or risk involved under accidental death or dismemberment insurance. Wahl v. Inter-State B. M. Acc. Assn., 201 Iowa 1355; Standard Acc. Ins. Co. v. Walker, 102 S. E. 585 (Va.); Employers Liability Assur. Corp. v. Morrow, 143 Fed. 750 (C. C. A. 6th Dist.) (Tenn.); Aetna Life Ins. Co. v. Claypool, 107 S. W. 325 (Ky.); Claypool v. Continental Cas. Co., 112 S. W. 835 (Ky.).

The question in an application as to *weekly indemnity* in other companies refers to matters of weekly indemnity injuries and has no reference to principal sum injuries. Standard Acc. Ins. Co. v. Walker, supra.

As to question 11 in the application it is quite obvious that it has no reference to the principal sum (death and dismemberment) insurance for the simple reason that the principal sum amount would invariably exceed the monthly wage, salary, or income of the applicant. It is conclusive that this question applies solely to Weekly or Monthly indemnity insurance and not to Principal Sum Insurance. General Acc. & Life Assur. Corp. v. Meredith, 132 S. W. 191 (Ky.). This answer if taken as applying to Principal Sum Insurance would on its face be preposterous. Concede for the moment that the amount of monthly indemnity insurance carried did exceed the monthly wage, salary or income of the applicant, where distinct items or classes of property are separately insured under one policy, the policy may be invalid as to one class without being invalid as to all classes thereunder by reason of a breach of conditions with reference to one item or class. Taylor v. Anchor Mut. Fire Ins. Co., 116 Iowa 625. The conditions of an accident insurance policy relating to loss of time have no application to principal sum injuries. Aetna Life Ins. Co. v. Bethel, 131 S. W. 523 (Ky.). It

is apparent that the appellee company was guarding against over-insurance in its risks and this is evidenced by the particular provision which it inserted in its policy form to wit:

"19. If a like policy or policies, previously issued by the company to the insured be in force concurrently herewith, making the aggregate indemnity for loss *other than that for loss of time on account of disability* in excess of $15,000, or the aggregate indemnity *for loss of time on account of disability* in excess of $100 weekly, the excess insurance of *either kind* shall be void—." (Writer's italics).

Here we find conclusive evidence that the appellee company acknowledged that two kinds of insurance were granted by the policy and that they were distinct and separable. Where insurance is made on different kinds of property, each separately valued, the contract is severable, even if but one premium is paid and the amount insured is the sum total of the valuation. Trabue v. Dwelling House Ins. Co., 25 S. W. 848 (Mo.), 23 L. R. A. 719. Policy conditions referring to matters of weekly indemnity have no application to principal sum matters. General Acc. & Life Assur. Corp. v. Meredith, 132 S. W. 191 (Ky.). It is a matter of common knowledge of which this court will take judicial notice that it is a general practice of accident insurance companies to issue policies covering accidental death and dismemberment losses only. As the amount of such insurance cannot be dependent upon the wage, salary or income of the insured to any greater extent than ordinary life insurance, it is then immaterial as to what income the assured may have as respects accidental death or dismemberment insurance, and for the reason that in no event does the policy cover injuries intentionally inflicted by the insured upon himself. There is no relation between the amounts of death and dismemberment or "principal sum" insurance and the weekly or monthly indemnity that an assured may carry. The limit set by the appellee company when compared with the amounts issued to appellant by the other companies is sufficient evidence on that point.

|  | Principal Sum | Monthly Indemnity |
|---|---|---|
| Limits in provision 19 | $15,000 | $400 |
| Bockes policy | 5,000 | 100 |
| Bankers Accident policy | 1,000 | 100 |

Mutual Benefit policy        2,000        80

The amount of either kind of insurance may be varied to suit the desire of the applicant. He may take a small amount of principal sum and a considerable amount of monthly indemnity or vice versa. This court said in Wahl v. Inter-State B. M. Acc. Assn., 201 Iowa 1355, in discussing an attempt to reduce the benefits payable for an accidental death on account of other insurance:

" '* * * [life insurance] in no way resembles a contract of indemnity * * * it * * * is what it is on the face of it—a contract to pay a certain sum in the event of death.' * * * The paucity of authorities is suggestive that few insurance companies have considered prorating as applicable to death benefits or life insurance. * * * It is urged that the insured might willfully incur or expose himself to a seeming minor injury, with the view of collecting accident insurance, and that the injury might result fatally. * * * We think the case supposed is too remote for serious consideration * * *."

Similar conditions apply to the dismemberment feature in the "Principal Sum" or "Specific Total Loss" feature of accident insurance policies. The Wahl case, supra, specifically approved Employers Liability v. Morrow, supra, wherein the facts presented disclose that the insured had reported that his earnings exceeded the amount of the weekly indemnity carried. The insured lost one arm for which a specific sum was payable under the policy. This is quite similar to the basis for the denial of all liability to the appellant under his policy in the instant case. There is no showing whatever here that the appellee company would not have issued to Bockes, had he applied for it, a death and dismemberment policy for an amount approximating $15,000 regardless of his monthly wage, salary or income.

Respecting question #20 and the answer thereto as found in the application, it is clearly specified that any false statements which are *material* either to the acceptance of the risk or the hazard assumed by the company, if made with intent to deceive, shall be a bar to recovery under the policy issued. At this point we may well inquire just what did the monthly or weekly earnings of Bockes have to do with the loss of two feet or two legs when the policy specifically provided that in such an event no

monthly indemnity was payable. We ask would anyone earning $1000 per month be less likely to slip and fall under a train than one earning $50 or $100 per week? The answer is obvious— earnings and slipping are in no way related to or dependent upon each other. In brief, death and dismemberment insurance has no relation whatever to the monthly wage, salary or income, and therefore such insurance is not affected by any statement in the application regarding earnings as these refer to and are material only to the monthly indemnity injuries.

Clearly a jury question was presented on the uncontradicted testimony offered by the plaintiff-appellant. Is it for the trial court to direct a verdict in the light of the statements made by President Schulz to Bockes, the insured, to secure the settlement which he did secure? Let us for the sake of emphasis repeat in sentence form the statements that led to the settlement. These are:

Appellant had no claim against the appellee company.

Appellant wasn't entitled to anything under the policy.

Appellant couldn't recover anything in a suit at law.

There was no liability of appellee company to appellant on account of the loss of two feet.

He felt sorry for appellant because of his loss.

He would rather give the appellant $1000 than to spend that amount in defense of a law-suit.

The basis of the denial of liability was that the appellant had made false statements in the application as respects the amount of his monthly wages or income. An insurance adjuster is presumed to know the law applicable to the situation and if he falsely represents the law, the same constitutes misstatements of fact and is fraud. Rauen v. Prudential Ins. Co., 129 Iowa 725. Schulz was an experienced claim adjuster. He was in a position to know the legal effect of every word, phrase, and clause in both the application and the policy forms used by the appellee company. Schulz as President executed every policy contract. He was in a position to know the law controlling insurance contracts issued by his company. *Scienter* lies in this fact. He is chargeable with the knowledge that the policy issued to the appellant provided for two kinds of insurance and that what might invalidate one kind would not affect the other. He was in a position to know that questions in an application respecting weekly

or monthly indemnity in other companies referred to matters of weekly or monthly indemnity injuries and had no reference to death or dismemberment injuries. Standard Acc. Ins. Co. v. Walker, supra. He was in a position to know that the amount payable for Principal Sum injuries is not affected by statements in the application as to earnings. (Employers Liability v. Morrow, supra, approved in Wahl v. Inter-state, supra.) It is strangely significant that the appellee company has not called to our attention a single authority that sustains its claim and proposition. The case of Graf v. Employers' Liability Assur. Corp., 190 Iowa 445, is not in point on the fact side. In that case a man was injured while engaged in a more hazardous occupation than that under which he was insured, and the decision invoked the effect of the pro rata clause on account of change of occupation and the settlement was made by the insuring company in the proper amount in accordance therewith. The settlement was questioned on the sole ground that the policy form had never been approved by the Auditor of the State as required by statute. There was no claim of fraud and this court held that the failure to have the policy form approved did not prevent the application of the pro rata clause. In the case at bar whether the statements by an insurance adjuster to secure a settlement were representations or merely expressions of opinion do constitute a question for a jury. Representations by an insurance adjuster through which an unfair settlement is obtained constitute fraud. Rauen v. Prudential Ins. Co., 129 Iowa 725; Owens v. Norwood-White Coal Co., 188 Iowa 1092. It is for the jury to determine whether an auto dealer's representations were mere expressions of opinion or representations of fact. Iowa Guaranty Mort. Corp. v. Lande, 202 N. W. 514 (Iowa). (Not officially reported.) Where one falsely asserts a material fact to be true as of his own knowledge and damage results, he is not thereafter permitted to assert that he had no knowledge upon the subject. John Gund Brew. Co. v. Peterson, 130 Iowa 301; Smith v. Packard & Co., 152 Iowa 1. Where the plaintiff is in fact ignorant of the law, and the other party knowing him to be so, and knowing the law, took advantage of such ignorance, to mislead him by a false statement of the law, it constitutes fraud. Berry v. Whitney, 40 Mich. 65; Hubbard v. McLean, 90 N. W. 1077 (Wis.). The appellant Bockes had had no experience in insurance business.

He was not versed in insurance law. On the contrary Schulz was an expert in insurance matters and is presumed to know the law. It is obvious that he did know. He did make assertions to Bockes relative to matters with which he was quite familiar, and under these circumstances Bockes had the right to rely on those assertions. In brief, Schulz was in a position to know and he will be charged with knowledge. Taylor v. Anchor Mut. Fire Ins. Co., 116 Iowa 625; Tott v. Duggan, 199 Iowa 238; First Nat. Bank v. Smith, 199 Iowa 1277. It will also be remembered and it is a significant fact that Schulz expressed sympathy and sorrow for the appellant. Expressions of solicitude and sympathy in an effort to gain the confidence of a party may be considered by the jury as bearing on fraudulent intent. Plaintiff-appellant testified that he relied upon what was said by Schulz. It is urged that there was a controversy between the appellant and appellee and that Schulz adjusted the same by a compromise settlement. This is not borne out by the record. True, it has always been the policy of courts to encourage the amicable settlement of all controversies, but as said in Kelly v. C. R. I. & P. R. R. Co., 138 Iowa 273, 280:

"* * * it is even more a matter of good policy and good morals to stamp the law's disapproval upon settlements which bear the taint of fraud and undue advantage."

The Kelly case affirms Rauen v. Prudential, supra, and re-affirms Coles v. Union Terminal Railway Co. 124 Iowa 48. The instant case is predicated on fraud and the same quantum of evidence is necessary that would carry any question of fraud to the jury and no more. The circumstances under which the settlement was made, the representations connected therewith and other matters herein disclosed, are all matters of fact, and are within the special province of the jury to determine. The plaintiff met his full burden of proof when he established that the policy contained two contracts of insurance, the loss of two legs and the undisputed representations made to him by the President of the defendant company in securing the release. In other words, the appellant met his burden by showing that the settlement was induced by representations that had nothing whatever to do with the loss of two legs. Putting the thought in another form, the record does not furnish a scintilla of evidence that question No.

11 of the application was answered falsely with intent to deceive, but on the contrary, the appellant testified that he answered all questions truthfully. It appears that the trial court in directing the verdict for the appellee insurance company assumed that the allegations contained in the appellee's answer with respect to false statements' having been made in the application were in fact proved, and that the burden was upon the appellant to disprove such allegations. The law forbids a party who has full knowledge of the ignorance of the other contracting party to not only encourage that ignorance, but also to knowingly deceive and lead the other party into a mistaken conception of his legal rights. Such a party may not shield himself behind the doctrine that a mere mistake of law affords no ground for relief. Carpenter v. Detroit Forg. Co., 157 N. W. 374 (Mich.). Summarizing the matters heretofore set out it is shown that any representation, true or untrue, of the appellant in his application for insurance respecting matters of weekly or monthly earnings as compared to the amount of weekly or monthly indemnity, has nothing whatever to do with the amount to be paid for principal sum injuries. I would reverse.