536

Commission of Appeals of Texas. Section B. Jan. 9, 1929.

E. C. Gaines, of Austin, for plaintiff in error.

Fouts, Amerman, Patterson & Moore, of Houston, for defendants in error.

LEDDY, J. This case arises under the Workmen's Compensation Act (Rev. St. 1925, arts. 8306–8309). Defendants in error recovered a judgment against plaintiff in error, which was affirmed by the Court of Civil Appeals. Upon the trial but one issue was submitted to the jury, the same being as follows: "Was the shooting of W. O. Parker by N. A. Crawford caused by a willful intention and attempt by W. O. Parker to unlawfully injure the said N. A. Crawford?"

The jury answered this question in the negative, and the Court of Civil Appeals held the evidence sufficient to sustain such finding.

Plaintiff in error insists that the evidence conclusively shows that W. O. Parker was killed while in the act of making a willful and intentional assault upon N. A. Crawford; the basis for such insistence being that N. A. Crawford's testimony shows a perfect case of killing in necessary self-defense, and that the jury had no right to arbitrarily disregard this uncontradicted testimony.

There was no other eyewitness to the killing. So far as what transpired at the immediate time, there is no direct evidence except that given by Crawford. His version is that prior to the killing Parker had indicated a resentful attitude toward him on account of his supposed interference with machinery in the engine room of which Parker was in immediate control, Crawford being superintendent of the entire plant. He testified that a few days prior to the killing, when he passed Parker, he had his knife whetting it on his hand, and hissed at him. Several witnesses testified that Parker had made threats to do bodily violence to Crawford prior to the date of the killing, one witness testifying as to a threat made on the morning of the killing.

As to the immediate circumstances out of which the killing arose, Crawford testified that he was in the engine room on the morning of the killing for the purpose of observing a thermometer in order to prevent a chemical solution getting at too high a temperature, and, while thus engaged, Parker cursed him and told him to stay out of the engine room, and that if he ever caught him in there again he was going to kill him. Crawford says he then left the engine room, and went to the front part of the plant, where his coat was hanging; that when he left home that morning he had placed a pistol in his side coat pocket, and when he arrived he hung the coat up in the front room of the plant; that he concluded to put on his coat and leave the plant; and that he took the pistol out of his coat pocket and put it in his hip pocket. His explanation as to why he changed the pistol from his coat to his hip pocket was that it seemed heavy for his coat. That as he started to put on his coat and leave the plant, he happened to think that a gasket was leaking in the engine room, and that he would fix it before he left. Laying down his coat, he went to the engine room, and it was on this occasion the shooting occurred in which Parker lost his life. The witness also stated that Parker had control of the engine room except when the plant was broken down, and that on this occasion it was not broken down. He gave no explanation as to why he did not depend upon the engineer, Parker, to fix the leaking gasket. He further stated: That at the time he went into the engine room he

thought Parker was in the ice vault, but found him in the engine room. That Parker immediately made a vicious assault upon him with an iron wrench. That he backed about 25 feet with his pistol pointed at Parker, and Parker striking at him, and that he was repeatedly struck with the iron wrench, his arm being bruised and made black and blue from such assault, and that he was also struck on the head with said wrench, raising a large lump. That he was struck on the thumb of the hand in which he was holding the pistol, and this caused it to be discharged.

The testimony further showed that immediately after the shooting, when some of the other employés came in, Crawford made a statement with reference to the deceased to the effect that, "I told him that would happen." One of the witnesses testified that immediately after the killing, when he got to the engine room, Crawford was in a very angry mood; the witness' expression being that he was "as angry as I ever saw any one."

There was no direct corroboration of Crawford's testimony that Parker was making an assault upon him at the time of the killing, except that given by one witness, who stated that Crawford's thumb was hurt. The witness followed this statement that Crawford's thumb was injured by giving the facts from which such conclusion was drawn. He stated that he saw blood on his thumb, but did not specifically state that he saw any bruise or cut place. No witness testified corroborating Crawford's evidence that there were black and blue places on his arm or a lump on his head, notwithstanding several of the employés came to the engine room immediately after the shooting, including Crawford's uncle, Mr. Irvin, who had raised him as a youth; the relation between them being almost like father and son. These employés were witnesses, and none of them gave any testimony as to seeing any bruise on Crawford's arm or head. Crawford also testified that the desk sergeant at the police station in Houston, where he was taken immediately after the killing, wanted to dress his injured thumb, but he declined to have it done. No one in the police department was called to corroborate Crawford's testimony on this point.

It appears that when one of the witnesses reached the engine room the deceased was lying on his back with both of his arms straight down against his sides, "just as if he had been put there." One of the witnesses, on arriving in the engine room, immediately ran to the deceased and placed his hand on his body to ascertain if he was alive. When he removed his hand, he found that it was bloody.

The above briefly states the facts sufficiently to elucidate the question which will hereafter be discussed. A more full and complete statement of the facts of the case will be found in the opinion of the Court of Civil Appeals, reported in 300 S. W. at page 230.

The sole question presented is: Was the jury justified in discrediting and rejecting that part of Crawford's testimony that the killing resulted by reason of the willful assault made upon him by Parker?

The jury are not compelled to believe uncontradicted testimony that is suspicious or that comes from an interested or biased source. Crawford had been indicted for the killing of Parker. It is true the indictment had been dismissed, but he was subject to be re-indicted at any time. He was necessarily interested in justifying himself in the killing of Parker, and the jury had the right to take this fact into consideration in passing on his credibility and the weight to be given his testimony. If the jury believed his story in regard to Parker's making an attack upon him at the time of the killing was improbable, unreasonable, or inconsistent in the light of his own testimony and other attendant circumstances, they were justified in disbelieving that portion of his testimony. As is said in Blankman v. Vallejo, 15 Cal. 639: "We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears. A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements. The inherent improbability of a statement may deny to it all claims to belief."

The clearest statement of the rule we have found is that by Mitchell, J., in Anderson v. Liljengren, 50 Minn. 3, 52 N. W. 219. He says: "The rule undoubtedly is that, where the positive testimony of a witness is uncontradicted and unimpeached, either by other positive testimony or by circumstantial evidence, either intrinsic or extrinsic, it cannot be disregarded, but must control the decision of the court or jury. But a witness may be contradicted by the facts he states as completely as by direct adverse testimony. A court or jury is not bound to accept it as true merely because there is no direct testimony contradicting it, where it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances in evidence, satisfy them of its falsity."

In the case of Sovereign Camp of Woodmen of the World v. Jackson, 138 S. W. 1137 (writ of error denied), the Court of Civil Appeals refused to set aside a finding upon a similar state of facts to those in this case, in which two witnesses had testified that the deceased was the aggressor in the difficulty in which he lost his life. It appeared that there was no direct contradiction of these witnesses. The court, however, sustained a contrary finding of the jury, saying: "The testimony of Pointer and of Ustynik is uncontradicted, it is true; but, if Pointer does not come within the class of interested witnesses, his concern in not making any damaging statements was so evidently apparent to the jury that they refused to accept it as true. And Ustynik's refusal

to testify for plaintiff as to material facts, and his statement of that which exonerated Pointer. as not being the aggressor, likewise found disfavor with the jury. It is not sufficient that this testimony was uncontradicted. Coats v. Elliott, 23 Tex. 613; Railway Co. v. Runnels, 92 Tex. 305, 47 S. W. 972; Heierman v. Robinson, 26 Tex. Civ. App. 491, 63 S. W. 658; Insurance Co. v. Villeneuve, 29 Tex. Civ. App. 128, 68 S. W. 206."

A similar rule is declared in the case of El Paso Foundry & Machine Co. v. De Guereque, 46 Tex. Civ. App. 86, 101 S. W. 814. The court, in affirming a judgment for the plaintiff, in referring to the testimony of defendant's implicated employés, said: "The jury, under our system of laws, are the sole judges of the credibility of the witnesses and the weight to be given their testimony, and they have the authority to reject the testimony of a witness, although he is not contradicted by other witnesses, when the circumstances cast a suspicion upon his statements, or render them inconsistent with reason and common observation." Ruling Case Law, vol. 28, p. 660, § 245, announces the rule to be: "However, while the jury are not warranted in arbitrarily or capriciously rejecting the testimony of a witness, neither are they required to accept and give effect to testimony which they find to be unreliable. although it may be uncontradicted." In the same connection it is further said: "A witness, though unimpeached, may have such an interest in the question at issue as to affect his credibility. Thus, where the testimony proceeds from a person who would be guilty of a criminal fault unless he vindicated himself from the presumption arising from the transaction, a question of credibility is presented for the jury, and they may disregard such testimony." In volume 8, A. L. R., page 796, may be found an exhaustive note where numerous authorities are collated sustaining the rule as to the right of the jury to discredit uncontradicted testimony in civil cases.

In the light of the well-settled rule announced by our courts, we think the jury was authorized to discredit that portion of Crawford's testimony that the killing resulted by reason of Parker's violent assault upon him. Based on the ordinary experience of mankind, the jury could have reached the conclusion that, if Crawford's arm was black and blue and a large lump upon his head from blows given by Parker with an iron wrench, he would have no doubt exhibited such wounds to his fellow employés, or at least to his uncle, Mr. Irvin, who was at the scene of the killing a few minutes after it occurred. These wounds would have furnished the strongest possible evidence corroborative of his statement that he shot Parker in his own necessary self-defense. If he did exhibit such wounds to the employés at the plant after the killing, they doubtless would have been asked to testify in regard thereto, as several of such employés, and Crawford's uncle, testified as witnesses upon the trial of this case. Neither of them were asked whether they saw any wounds on Crawford's arm or head, and only one gave any testimony as to the injury claimed to his thumb. It is fairly inferable from his testimony that this witness' testimony as to the thumb injury was a conclusion upon his part based upon the fact that he saw blood upon Crawford's thumb. This could have been accounted for by the fact that it came from the body of the deceased, as one of the witnesses admitted he got blood on his hand in endeavoring to ascertain whether Parker was dead or alive. Crawford also testified that the pistol he used in the shooting was battered so that the marks from Parker's weapon were plainly visible thereon. The pistol, however, was not produced, or its absence in any way accounted for.

In addition to the circumstances detailed above, the further fact that Crawford was in a violent stage of anger immediately after the killing is inconsistent with his testimony that he shot Parker in his own necessary self-defense. Under ordinary circumstances, a man who does not kill on account of malice, but shoots in protection of his own life, would more naturally exhibit a spirit of remorse and regret than one of extreme anger and resentment.

The further fact that, after Parker had threatened Crawford's life, he went to the room where his coat hung and took a pistol therefrom, placed it in his hip pocket, and immediately went back to the engine room, instead of letting Parker fix the defective machinery, in connection with the further fact that Crawford was in an extremely angry mood after the killing, justified the inference that he was smarting under the insulting language used toward him by Parker, and that by reason thereof he procured his pistol, returned to the engine room, and shot Parker, solely because of the resentment aroused by his previous treatment at Parker's hands.

Again, Crawford's statement, made to a witness immediately after the killing, that "I told him (deceased) that would happen," indicated that at some time prior to the killing he had threatened Parker's life. It could have no other meaning than that he had warned Parker he was going to kill him. At least, the jury, in the absence of any explanation of the meaning of such remark, were justified in finding that Crawford had indicated his intention to kill Parker before any occasion had arisen wherein his life was placed in danger from an assault.

After a careful review of the entire record, we are unable to agree with plaintiff in error's contention that there is no evidence of probative force to sustain the finding of the jury in answer to the special issue submitted. The jury were authorized under all the facts

in disbelieving that portion of Crawford's testimony that Parker was in the act of assaulting him at the time of the killing. With this testimony eliminated, it was not conclusively shown that Parker was the aggressor in the difficulty. Threats made by Parker were circumstances tending to show he was the aggressor, but the same were not conclusive of such fact.

We therefore recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.