JENNIE VANDE STOUWE, Administratrix, Appellee, v. BANKERS LIFE COMPANY, Appellant.

No. 42233.

May 15, 1934.

Rehearing Denied December 13, 1934.

Shull & Stilwill, R. B. Alberson and J. P. Lorentzen, for appellant.

Raymond N. Klass, and Van Oosterhout & Kolyn, for appellee.

Claussen, C. J.—On November 24, 1924, the Bankers Life Company issued to Jacob Vande Stouwe a life insurance policy upon his life. The policy contained provisions for the payment of benefits in case he became totally and permanently disabled. On the 13th day of the following January he entered a sanitarium in Denver, Colorado. During the following April he made a claim against the company for disability benefits. In the claim for disability benefits he stated that his disability began January 1, 1925, some five weeks after the policy was issued. His disability was described as "Lungs—Respiratory". In the claim he states that he consulted a physician on December 20, 1924, "after my last breakdown whom advised me to come here or some san." Attached to and made a part of the claim was a statement of a physician at the Denver sanitarium which contained the following question and answer:

"Give full history of the disease or accident from the beginning up to the present time.

"Probably began with a heavy cold in 1912 has coughed ever since. Had a breakdown in summer of 1924. Again in Sept., 1924 lost weight and suffered from extreme weakness. Has been in bed, running considerable temp. since coming to the Sanitarium in Jan., 1925."

Vande Stouwe returned to Iowa and was taken to the state tuberculosis institution at Oakdale. He died of tuberculosis on or about December 26, 1925.

In July of 1925, while Vande Stouwe was at Oakdale, the company sent one of its representatives to see him. This agent took with him Vande Stouwe's application for the policy, his claim for disability benefits, some reports, not in the record, relating to an investigation made by the company concerning the physical condition of Vande Stouwe, and a letter from Dr. Scarborough, who was in charge of the Oakdale institution, in which the doctor states that Vande Stouwe came to the hospital on May 11, 1925, with far advanced tuberculosis of the lungs. The agent interviewed Vande Stouwe in the sanitarium, and the documents above referred to were discussed and such as were not confidential were shown to Vande Stouwe. The agent advised Vande Stouwe that the company could not reconcile the answers of Vande Stouwe in his application for the policy with statements in his claim for disability benefits and the information obtained from the other sources above referred to; that unless a compromise could be made the company would employ counsel at Iowa City to secure the cancellation of the policy; that the expense to the company of so doing would be in the neighborhood of $250; and that the company would pay that amount for the cancellation of the policy. After some discussion, it was agreed that $275 should be paid to Vande Stouwe for the cancellation of the policy. Accordingly blank spaces left for names, dates, and policy numbers, in a typewritten compromise agreement, which had been prepared by the agent before he left the home office, were filled in, in pen and ink, and the agreement was signed by Vande Stouwe. It is sufficient to say that the agreement purported to discharge the company from liability on the policy. Simultaneously, a change of designation of beneficiary was signed by Vande Stouwe, changing the beneficiary from Jennie Vande Stouwe, wife of the insured, to the executor or administrator of the insured. The policy was not then in the possession of Vande Stouwe. It contained the usual provision that a change of beneficiary should not be effective unless properly indorsed on the policy by the company. The policy was not returned to the company and the change of beneficiary was not indorsed on the policy. At the same time, the agent drew a draft on the company in favor of Vande Stouwe for $275 and delivered it to Vande Stouwe. The draft was paid by the company. Vande

Stouwe was taken to the home of his sister in Orange City on October 31, 1925. A photostat of the draft is in the record. The draft was indorsed by Jacob Vande Stouwe and by H. Vande Stouwe. The back of the draft bears the stamp of the First National Bank of Hull, Iowa, and the stamp of the First National Bank of Sioux City with the date November 18, 1925. The face of the draft is marked "Paid 11/19/25 D. M. Natl. Bank." The draft thus indorsed and stamped is in evidence, without objection to any of its indorsements. The introduction of the draft was objected to but such general objection was properly overruled by the court.

As before noted, Jacob Vande Stouwe died on December 26, 1925. On January 16, 1926, Van Oosterhout & Kolyn, counsel for Mrs. Vande Stouwe, wrote to the company concerning the policy. On January 29, 1926, the company, in a letter to such attorneys, denied liability on the policy and sent them a photographic copy of the release above referred to. The matter seems to have remained in repose in this situation until March 5, 1929, when Raymond N. Klass appears to have written to the company concerning the policy and to have given the company notice of a claim of lien for attorney fees. In response to this letter the company denied liability on the policy. On November 15, 1929, in an effort to give jurisdiction over a suit on the policy to the Linn district court, Mrs .Vande Stouwe assigned a one-tenth interest in the policy to Anne T. Klass, the wife of Raymond N. Klass, as trustee, but subsequently such interest was reassigned to Mrs. Vande Stouwe as administrator of her husband's estate. Mrs. Vande Stouwe was named in the policy as beneficiary. It has been noted that at the time the release agreement was signed, the beneficiary was changed to the executor or administrator of the estate of the insured. No doubt for the purpose of avoiding question concerning the right of the administratrix to sue, Mrs. Vande Stouwe joined with Mrs. Klass in executing the assignment of the policy to Mrs. Vande Stouwe as administratrix. On the 18th day of August, 1930, this action was brought by the administratrix to recover damages for the "malicious, wilful and wanton" breach of the contract. The amount of damages claimed was $2,200 and interest as actual damage and $8,000 punitive damage. By the time the issues were settled, however, the case had degenerated into an action to recover on the policy, and, in the main, the case was tried as such, and was so submitted by the court to the jury. The jury returned a verdict for the plaintiff, and from judg-

ment rendered on the verdict, and various rulings of the court, this appeal is prosecuted.

I. Many errors are assigned and argued. A number of the assignments of error have merit. But, as may be supposed, the case turns largely upon the effectiveness of the instrument alleged to have been executed by the insured at Oakdale, releasing the company.

In the first instance plaintiff claims that the signature on the instrument was a forgery. For the purpose of sustaining this allegation she introduced in evidence five checks of a former employer bearing the insured's signature. No other evidence bearing on the question was introduced by her. In this situation she contends that a jury question was raised on the issue of the genuineness of the signature on the release. The original checks and release are before us. Our comparison of the signatures leads us to the conclusion that the signature on the release is the genuine signature of the insured. It is, of course, not our province to weigh the evidence. We have made the comparison and expressed our conclusion only because we have been invited to do so by appellee. The signatures on the checks are not the only evidence bearing on the question whether the signature on the release was written by the insured. The agent of the company testified that the release was signed by the insured. A draft issued by the company to the insured at the time the release was executed was placed in the bank for collection after Vande Stouwe was removed from Oakdale to the home of his sister, and was duly paid by the company. That the draft was cashed by Vande Stouwe is not questioned and is not subject to doubt. In this situation the introduction of the checks in evidence did not make a jury question concerning the genuineness of the insured's signature on the release. We have long ago abandoned the rule that a scintilla of evidence raises a jury question.

Plaintiff pleaded that if the insured signed the release, he was in such physical and mental condition that the execution of the release was of no validity. The trial court withdrew this issue from the jury. We may say in passing that the action of the trial court in this respect was undoubtedly correct for there was no evidence in the record warranting the submission of the question to the jury.

This brings us to the point where plaintiff is confronted with a release and discharge of the policy bearing the signature of the insured. Plaintiff seeks to avoid the effect of the release by saying that it was obtained by fraud. She also says that the release and the

incidents attending its execution were in effect a compromise and settlement; that the insured was then practically on his death bed; that the policy called for the payment of a definite sum of money; that there was and could be no bona fide dispute concerning the validity of the policy and as a consequence the obligation on the $2,000 policy could not be discharged by the payment of the draft for $275, given at the time the release was signed. It is apparent that the last-mentioned contention turns primarily on the question whether a bona fide dispute existed between the company and the insured concerning the validity of the policy. We have the original policy and the original application for the policy before us. The application consists of three pages, one page is the application proper for the policy, one page is for answers of applicant made to the medical examiner, and one page is a report of a medical examiner. It is insisted by plaintiff that because the insured was examined by a medical examiner, the company, under the circumstances in this case, was precluded from questioning the validity of the policy, and that consequently there could be no bona fide dispute between the company and the insured to support the compromise and settlement.

This contention is based on Code section 8770, which reads as follows:

"Physician's certificate—conclusiveness. In any case where the medical examiner, or physician acting as such, of any life insurance company or association doing business in the state *shall issue a certificate of health or declare the applicant a fit subject for insurance, or so report to the company or association* or its agent under the rules and regulations of such company or association, it shall be thereby estopped from setting up in defense of the action on such policy or certificate that the assured was not in the condition of health required by the policy at the time of the issuance or delivery thereof, unless the same was procured by or through the fraud or deceit of the assured." It is plaintiff's thought that because the insured was examined by a doctor at the instance of the company the section is applicable.

Before proceeding further with the discussion, it may be well to determine where the burden of proof rested, in establishing the execution of the settlement and in avoiding its consequences. The burden of proving that the release was executed rested upon

the insurance company. It was under this burden of proof from the beginning to the end of the case. Barber v. Maden, 126 Iowa 402, 102 N. W. 120. But when the execution of the release was once established, the burden was on plaintiff to establish that the release was invalid on account of fraud perpetrated on the insured at the time the release was executed. In Coffman v. Brenton, 214 Iowa 185, 239 N. W. 9, Mr. Justice Faville, speaking for the court, said:

"The settlement having been made, the payment received by appellant, and the written instrument executed by him, the burden of proof rested on the appellant to impeach the transaction by proof of fraud."

Likewise plaintiff had the burden to establish that the demand of the insurance company which was compromised and released at the time of the execution of the release was totally unfounded. In Sullivan v. Collins, 18 Iowa 228, this court said:

"But, in order to avail himself of such defense, the defendant must show clearly that the claim, which was the foundation of the promise, was unfounded, and could not have been prosecuted with effect."

See, also, Johnson v. Berdo, 131 Iowa 524, 106 N. W. 609; Johnson v. C., R. I. & P. Ry. Co., 107 Iowa 1, 77 N. W. 476; Kilmartin v. C., B. & Q. Ry. Co., 137 Iowa 64, 114 N. W. 522; Blossi v. C. & N. W. Ry. Co., 144 Iowa 697, 123 N. W. 360, 26 L. R. A. (N. S.) 255; Kilby v. C. C. W. Ry. Co., 191 Iowa 926, 183 N. W. 371; Cantonwine v. Bosch Bros., 148 Iowa 496, 127 N. W. 657; Bockes v. Union Mut. Casualty Co., 212 Iowa 499, 232 N. W. 156.

We have already expressed the conclusion that the record establishes without dispute that the release was executed by the insured while mentally and physically competent to do so. The insurance company has carried the burden of proof resting upon it and must prevail unless plaintiff has made out a case requiring the submission to the jury of one or both of the following questions, namely, (1) Was the execution of the release procured by fraud? and (2) Was the contention of the insurance company so completely unfounded that it would not support a compromise and settlement?

Whether the release was in truth executed by the insured, whether its execution was obtained by fraud, and whether the dis-

pute between the insured and the insurance company was or was not unfounded are questions of fact. We have recognized, however, that such questions can only be submitted to the jury when the case made in the trial court presents sufficient evidence to warrant their submission. Bockes v. Union Mut. Casualty Co., supra; Kilmartin v. C., B. & Q. Ry. Co., supra; Johnson v. C., R. I. & P. Ry. Co., supra; Blossi v. C. & N. W. Ry. Co., supra; Kilby v. C. C. W. Ry. Co., supra.

Having disposed of these preliminary questions of law, it may be well to first consider whether the record contains sufficient evidence to warrant the submission of the question whether the dispute between the insured and the insurance company was so unfounded as to be incapable of being the basis of a valid compromise and settlement. As has been noted, plaintiff's principal contention in this respect is that in virtue of the provisions of Code, section 8770, above quoted, the company was conclusively estopped from claiming that the insured was not in the condition of health required by the policy at the time it was issued and delivered, and, that in view of such absolute and conclusive estoppel, the claim of the insurance company that the policy could be canceled for fraud in obtaining it was totally unfounded and without merit. In the absence of statutory estoppel the record abundantly warrants the conclusion of the insurance company that the answers of the insured concerning his health were both false and known by him to be false. The policy was issued under date of November 24, 1924. On the 13th day of January, 1925, the insured was in a sanitarium in Denver, Colorado, afflicted with tuberculosis of the lungs. In a claim for total disability benefits filed by the insured against the company, the insured in his own handwriting makes reference to a breakdown suffered by him in the year 1924. He designates this breakdown as "my last breakdown". The statement of the physician accompanying the claim for disability benefits recites that the insured's condition had its inception twelve years before the policy was issued and that its progress was marked with loss of weight and extreme weakness. It is further stated that the insured had a breakdown in the summer of 1924 and again in September of 1924. In May of the year 1925, the insured was admitted to the state tuberculosis sanitarium at Oakdale and the physician in charge of that institution reported to the insurance company that the insured was suffering with far advanced tuberculosis of the lungs. The answers

of the insured to questions in the application for the policy concerning his health were entirely negative. In this situation it is perfectly apparent that the officers of the insurance company could in good faith and with abundant reason entertain the conviction that the answers of the insured concerning his health were untrue and were known by him to be untrue. The question is not whether the answers of the insured were in very truth untrue and known by him to be untrue but is whether the officers of the insurance company could in good faith reasonably believe them to be fraudulent.

A reasonable question undoubtedly existed as to whether the estoppel created by the statute could be invoked against the company in this case in view of the exceptions against fraud and deceit contained in the statute. Under the decisions of this court it is not open to doubt that the dispute between the insurance company and the insured was of such character that it might be the subject of a compromise and settlement. A claim that is entirely baseless and without foundation in law or equity will not support a compromise. Tucker v. Ronk, 43 Iowa 80. But this does not mean that because one party may ultimately be able to maintain his position, the matter in dispute cannot be compromised. In Cantonwine v. Bosch Bros, 148 Iowa 496, 127 N. W. 657, Mr. Justice Weaver, speaking for the court, said:

"We shall not undertake any review of this evidence. While much of it is to our minds of a very weak and inconclusive character, there is some which, if true, tends quite clearly to sustain the accusation preferred by the defendants. To say the least, it makes a case from which it is impossible for the court to find that the charge was made in bad faith or for the mere purpose of extortion. That defendants believed they had been robbed by the plaintiff we think is evident, and we have little doubt they in good faith believed they had a valid claim against him for damages. Such being the case, then, if they asserted such claim, and plaintiff yielded to their demand and voluntarily delivered to them the securities in compromise or settlement thereof, the law will not permit him to repudiate the settlement and recover his property, even though he is able to show conclusively that the charge made against him was without foundation."

See, also, Rowe v. Barnes, 101 Iowa 302, 70 N. W. 197; French v. French, 84 Iowa 655, 51 N. W. 145, 15 L. R. A. 300; Sullivan

v. Collins, 18 Iowa 228. It seems that when the parties in good faith are asserting conflicting rights, the dispute will support a compromise. In Richardson & Boynton Co. v. Independent District of Hampton, 70 Iowa 573, 31 N. W. 871, the dispute was due to difference in views of the parties as to the proper construction of a contract. In the very nature of things one or the other was right, and one or the other of the parties was without right. The court said in that case:

"All that we need know is that there was a controversy between the parties, each claiming in good faith rights in itself, and liabilities against the other, wherefrom arose a subject of dispute capable of being settled and compromised."

After a very full discussion of the rules, and an exhaustive examination of the authorities, Mr. Justice Vermilion, in Partello v. White, 197 Iowa 24, 196 N. W. 719, stated the rule as follows:

"Briefly stated, the conclusion is that the compromise of a doubtful right asserted in good faith is a sufficient consideration for a promise, and it is not material on which side the right is ultimately found to lie." See, also, Marron v. Lynch, 215 Iowa 341, 245 N. W. 346; Abell v. Partello, 202 Iowa 1236, 211 N. W. 868.

It must be remembered that the question under consideration is not primarily one of defense against the policy, but is rather of avoidance of the compromise and settlement. It is not a matter of the insurance company proving that the policy was void because of fraud and deceit of the insured. It is a matter of plaintiff proving that the insurance company at the time of the compromise did not assert in good faith that the policy was invalid because of fraud and deceit. The record abundantly sustains the good faith of the insurance company in asserting that the policy was invalid, and contains not a single circumstance tending to establish that the position of the company in that respect was not bona fide. There was no evidence in the record which would warrant the submission to the jury of the question whether the difficulties between the company and the insured were of such character as to support a compromise and settlement.

Bearing in mind the burden resting on plaintiff to prove that the release was procured by fraud, we will proceed to a consideration of plaintiff's contention that the release was procured by fraud,

in consequence of which it was invalid. Plaintiff rested her case upon formal proof of matters essential to recovery in the usual action on a life insurance policy. Thereupon a motion for a directed verdict was made by the defendant and overruled by the court, whereupon the insurance company proceeded with its case. The agent who procured the execution of the release was produced as a witness for the company.

He was a certain A. R. Campbell, an attorney formerly employed in the office of the insurance company, but no longer in the employ of the company at the time of trial. He was not generally assigned to the adjustment of claims but was employed in the office on the general legal business of the company. He was, however, specially assigned to handle this matter. Before leaving the home office he was instructed to retain the services of the Dutcher law firm at Iowa City, in case the matter required further legal attention. His testimony in relation to his dealings with the insured is, in substance, the following:

Direct examination:

"When I got to Oakdale, I first went to see Dr. Scarborough who was the Medical Examiner in charge of the Sanitarium. I wanted to ascertain what Mr. Vande Stouwe's condition was, that is whether he was in physical condition to transact business in connection with his policy. Dr. Scarborough, after he found out what I wanted to see Jacob Vande Stouwe about, gave me permission to see him. Dr. Scarborough had a nurse introduce me to him. I explained to him the object of my visit. I showed him the application for disability benefits which he had made on the Company and I showed him the application to the company for the insurance policy. As I remember it I did not show him the letter from Dr. Scarborough (Exhibit 'C'), but did tell him the contents. While Mr. Vande Stouwe was looking at Exhibit 'A', being proof of claim for disability benefits, and Exhibit '13-A and B', being his application for insurance, I pointed out to him certain facts relating to his condition and the Doctor's reports as to his condition, and asked him to tell me what he thought of the discrepancies. I explained to him the application for claim and showed him Dr. McLeod's signature from the Sanitarium at Denver and I told him it would be necessary for us to arrive at some sort of compromise on his claims or I would have to instruct the attorneys at Iowa City to file suit in equity to cancel the policy. I told him our basis for

canceling the policy was misrepresentation of material facts, in procuring the policy. I read the questions and answers as contained in Exhibits '13-A and B' and told him we couldn't reconcile the answers and that we believed them to be untrue. He asked me a good many questions as to the source of some of the information which we had, some of which I didn't feel at liberty to answer because they were confidential in nature, and at the conclusion of the conversation he said—I remember his words—'I guess I better settle.'

"I didn't take up the matter of misrepresentations any further and asked him what he had in mind as to a settlement figure and he said $1,000.00. I told him we were not in a position to pay One Thousand Dollars, but that I could give him what I thought would be approximately the expenses in bringing a suit in equity to cancel the policy, and if he wanted that sum I would have the Bankers Life Company pay it to him, and I told him that as near as I could estimate that figure it was in the neighborhood of $250.00. As the result of our negotiations I told him I would give him $275.00 and if he didn't want that I would see the attorneys at Iowa City and have them institute suit to cancel the policy. He said he would accept that amount and I told him it would be necessary for him to execute a change of beneficiary form because the beneficiary named in the policy was not present. The beneficiary was his wife and he told me she was in Rock Valley. I asked him where the policy was and he said the policy was at his home. Exhibit 'D' is the change of beneficiary form, which the insured has reserved the right to change the beneficiary. I filled in this change of beneficiary form in Mr. Vande Stouwe's presence and showed it to him and told him to read it and showed him the place where he was to sign it and he signed it in my presence. I then filled out the terms of the Compromise Agreement Form, read the agreement to him and had him read it and told him to sign it and he signed it and I witnessed it myself. I then drew a draft on the Bankers Life Company of Des Moines, Iowa, for $275.00 and gave it to Mr. Vande Stouwe and then I returned to Des Moines where I reported the matter to Mr. Martin Roe, Assistant Secretary, and turned the file over to him and he approved my actions in the matter."

Cross-examination:

"I showed him the application which he had made for the insurance and told him that if we couldn't get together on a compro-

mise I was going to Iowa City and employ attorneys to bring an action to cancel the policy. I told him we had a right to bring a suit to cancel the policy. I don't remember whether we talked about whether we could win the lawsuit or not, I simply discussed the proof we had and pointed out certain statements which he had made which weren't true. I set forth the grounds we had upon which to bring a lawsuit but didn't discuss the outcome of the suit, but did state to him the reasons why I thought there should be a compromise.

"I went down to Oakdale from Des Moines to find out whether his statements in his application were true or false and there was no doubt in my mind when I left there that they were false. I judged this from his looks, his questions about where we got the information, his very evident surprise when I produced the report from the doctor at Denver and his bargaining over the consideration. He did not admit that he had made false statements and misrepresentations in the application but his exact words were, 'I guess I better settle'. I went down there with an open mind and without any intention of robbing him or anything of the sort. I took down the compromise agreement simply as a matter of convenience to myself. I told him I thought we had the right to bring a suit to cancel the policy. I represented to him what I thought the Company's rights were in the matter. I did not make any statement to him as to his rights under the circumstances as I presumed he knew of his right to defend the suit. I called his attention to misrepresentations of material facts and went over the application and other documents with him. I am not a physician and surgeon and have no underwriting experience. I know what facts are material. When an application for life insurance, including the medical examination is referred to the Home Office it goes to the underwriting and medical departments and I, as a Lawyer in the law department do not see it unless some legal matter comes up in connection with the policy. In addition to Mr. Vande Stouwe saying, 'I guess I better settle', he expressed surprise and wondered where we had gotten some of the information we had. I didn't ask him whether he knew the statements were true or false at the time he made them as I did not wish to call him a liar. From his expressions and hints before I left the room I knew in my own mind definitely as to the falsity of the statements made by him. Dr. Scarborough was in the large hospital building and I was taken to Mr. Vande Stouwe's

room by a nurse. I don't know anything about the consent given by Mr. Vande Stouwe to Dr. Scarborough to disclose information regarding his condition. In discussing the amount of settlement I told him the expense of trying a lawsuit to cancel the policy would probably be about $250.00 and that I could either give it to him or to the attorneys. I didn't suggest that the best thing for him to do was to accept the offer. I showed him the different papers I have heretofore discussed."

Upon rebuttal plaintiff introduced the testimony of a member of the elevator company for which the insured worked during the year 1924, which was in substance that the insured had not been absent from his duties in the year 1924. Plaintiff herself testified that the insured's prior health had been good, and that he had not suffered with a breakdown in 1924 and that she noticed no change in his physical condition in the years 1923 and 1924.

If the question was whether the policy was obtained by fraud and deceit of the insured, the record would make a case to go to the jury. But that is not the question. The question is, was the release obtained by fraud? The defense is not that the policy was obtained by fraud. It is, that the liability of the company on the policy had been compromised and released. That the insured executed the release is certain. To avoid the release plaintiff must prove fraud, that is to say, that the execution of the release was obtained as a result of reliance on statements that were false and known to be false. Bockes v. Union Mutual Casualty Co., 212 Iowa 499, 513, 232 N. W. 156. A careful reading of the record in a light most favorable to plaintiff does not so much as cast suspicion on the truth of any statement made by Campbell to Vande Stouwe and the record contains absolutely nothing to indicate that any statement made was known by Campbell to be false.

But plaintiff argues that Campbell was a lawyer working in the office of the insurance company, and consequently must have known that the company had no defense to the policy. We have fully discussed this phase of the case in a preceding paragraph of this opinion and will not repeat the discussion at this place. But see Johnson v. C., R. I. & P. Ry. Co., 107 Iowa 1, 77 N. W. 476. We need only say that Campbell, as a lawyer, could conscientiously insist that the policy was cancelable in an action by the company. The rights of the insured under the policy were not so certain as

to make the statements actually made by Campbell false in any sense.

Plaintiff argues with great force that Campbell's statement that suit would be brought in Iowa City to cancel the policy was of necessity false and fraudulent. She says that the threat to sue the insured in a county far from his home and in the wrong county was certainly fraudulent in view of the fact that Campbell as a lawyer must have known that the insured could only be sued in the county of his residence. An examination of Campbell's testimony fails to show that he threatened to sue the insured at Iowa City. Before leaving the home office he had been instructed to retain the Dutcher law firm at Iowa City if the services of counsel were required. He told the insured that if the matter was not compromised, he would see lawyers in Iowa City. Other reasons deprive the contention of all merit, but sufficient has been said to fully dispose of it.

Plaintiff contends that since the insured is dead and the facts surrounding the execution of the release were known only to Campbell, who was the agent of the insurance company, jury questions are presented by the record upon the question of the execution of the release and fraud in its procurement. Her argument on this contention embraces several phases. We shall not notice the contention further than to say that proof of the execution of the release and of the compromise and settlement does not rest solely on the testimony of Campbell. The signature of the insured appears on the release itself as well as on the change of beneficiary and on the draft given to him at the time the release was executed. The draft was presented for payment long after the release was executed and after the insured had returned to the neighborhood of his own home and to the home of his sister. The case before us has none of the aspects of the cases cited by plaintiff in support of this phase of the matter. See, for instance, Holmes v. Connable, 111 Iowa 298, 82 N. W. 780, and Bremer v. Haag, 151 Iowa 449, 131 N. W. 667, cited with cases from other courts by plaintiff. That a compromise and settlement of matters in dispute between the insured and the company was made, is conclusively established by the record. The only evidence offered to refute it are the five checks, which, we have suggested, establish rather than refute the genuineness of the signature on the release. On the question of the validity of the release the burden was on plaintiff. She cannot be heard to

complain that she cannot carry this burden because Campbell was the only witness present when the release was signed, and this is especially true in view of the fact that Campbell was a witness and was subjected to extended cross-examination by her counsel. The disposition that must be made of this appeal is clear if it is borne in mind that, in the peculiar situation existing in the case, defendant need not defeat the policy but may rely upon the compromise and settlement, while plaintiff, to be successful, must break down the release. In this task she does not have the aid of many provisions of the Code which would materially aid her if her task were only to sustain the policy.

■ II. Thus far the case has been considered in the views presented by the parties. The case has another aspect. Usually the terms "compromise and settlement" and "accord and satisfaction" are applied to the final adjustment of a closed transaction. They are usually the final settlement of a closed incident or past transaction. In the case of a closed episode, where, in the nature of things, the status and rights of the parties have been fixed by past events, the quest is ever for a consideration to support the agreement of final settlement. But this is not true where the end of the venture has not been reached, for in that situation the parties have present and future rights and liabilities arising from the existing and continuing relations. That future rights and liabilities may be the subject of contract between parties is not open to doubt. That the contract under which such future rights and liabilities will arise may be canceled by a new agreement is equally certain. 13 C. J., page 600, section 621 et seq. In such case there is ample consideration for the new agreement even though there be perfect accord between the parties to the old contract. Richards v. W. H. Hellen & Son, 153 Iowa 66, 133 N. W. 393. A bona fide dispute is not necessary to sustain such contract. When the incident to be settled or adjusted is a closed book, a bona fide dispute must exist to sustain a compromise, but until events have brought an end to the relationship and thus fixed the rights and liabilities of the parties, the parties may contract as they will in relation to their past, present, and future rights and liabilities. In the case before us the relations between the company and Vande Stouwe growing out of the policy were not at an end, when the compromise was being negotiated. Under the policy, rights and liabilities were bound to accrue to each in the future. Vande Stouwe was not dead. The

policy had not accrued. The parties to the policy had a perfect right to contract as they saw fit in relation to their rights and liabilities under the policy. It was with reference to such rights and liabilities that the parties contracted. There was a dispute between the company and Vande Stouwe, but they could have canceled the policy by mutual agreement even though no dispute had existed. The dispute was the occasion for the negotiation of the release, but the agreement for the release of the policy was in no sense dependent for validity upon the existence of a dispute between the parties.

In this aspect of the case it becomes entirely immaterial whether Code, section 8770, was or was not applicable to the situation, and it likewise becomes immaterial whether Vande Stouwe did or did not procure the policy through fraud. This must be true, for the parties had a perfect right to cancel the policy entirely independent of the existence of a dispute.

This does not mean that the new agreement would be valid even though obtained through fraud, for we have demonstrated that the agreement was not obtained by fraud.

For error in the refusal of the trial court to sustain defendant's motion for a directed verdict made at the close of the whole case, the judgment of the trial court is reversed.—Reversed.

EVANS, STEVENS, ALBERT, KINDIG, ANDERSON, and KINTZINGER, JJ., concur.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority opinion and therefore respectfully dissent.

According to the majority's opinion, the lower court should have directed a verdict in favor of the appellant. The opinion sets out that the question in this case is not one of defense against the policy, but is rather one of avoidance of the compromise and settlement, and that the burden rests upon the appellee to prove that the release was procured by fraud. It seems to me that there were sufficient circumstances surrounding the securing of this release and compromise, that the question of whether there was fraud in the securing of the settlement was one for the jury to decide.

The insured in this case had taken a medical examination. There is no claim that he made any fraudulent statements to the doctor who examined him. That doctor was an employee of the Bankers Life Company, and he testified that he did not rely upon any statements made to him by the insured at the time the examina-

tion was taken. The insured passed the examination and the policy was duly issued to him by the Bankers Life Company. The insured thus was protected under Code, section 8770, and the policy was binding upon the company unless there was fraud used in the securing of the policy. A few months after the policy was issued, we find the insured in a sanitorium in Colorado. Then, in July of the same year, he was at the sanitorium at Iowa City, in bed, suffering from an advanced case of tuberculosis. He was 300 miles from home, confined in this hospital, without any relatives, friends, or advisers. A lawyer, representing the appellant company, appeared at the hospital. He had a compromise and settlement agreement prepared. In addition to that, a change of beneficiary, changing the beneficiary from the wife of the insured to his estate. He secured permission of the hospital authorities to go to the insured's room and see the insured. The insured was in bed, suffering from an advanced case of tuberculosis, the record showing that within five months after the date of the visit of the attorney representing the Bankers Life Company the insured was dead, having died from tuberculosis. There was no one else present in the room except the insured and the attorney. According to the testimony of the attorney, he informed the insured that the insured had made false statements in order to secure the policy and that the company was going to cancel the policy. There was some talk and discussion, and argument, between the insured and the attorney, in regard to the cancellation of the policy, and finally the attorney representing the Bankers Life Company stated to the insured, "If you do not make this settlement I am instructed to hire the Wade and Dutcher firm, one of the best in Iowa, to commence an action to cancel this policy." After this statement the insured signed the settlement and compromise, accepting the sum of $275, and also made the change of beneficiary.

In the case of McCowen v. Short, 69 Ind. App. 466, 118 N. E. 538, p. 540, 119 N. E. 216, it was said:

"When it appears that the parties occupy such unequal positions, and that the one occupying the superior position has gained a substantial advantage over the other, the law intervenes in behalf of the weaker person or the one from whom such advantage has been so gained, and raises a presumption of fraud, or unfair or unconscionable dealing in his favor, which, when duly presented, makes out a prima facie case in his favor entitling him to redress,

unless the other party by proper proof overcomes such inference or presumption of fraud.

"When the facts are sufficient to raise the presumption of fraud or unfair and unconscionable dealing, as above indicated, the injured party is thereby entitled to recover such damages as he has sustained as the proximate result of such fraud, unless the other party by due proof overcomes the prima facie case so made as aforesaid. 12 R. C. L. pp. 232, 234, 424, 427, and notes; Keys v. McDowell, 54 Ind. App. 263-269, 100 N. E. 385; Firebaugh v. Trough, 57 Ind. App. 421-428, 107 N. E. 301, and cases cited; Vandalia Coal Co. v. Alsopp, 61 Ind. App. 649-657, 109 N. E. 421; Meldrum v. Meldrum, 15 Colo. 478, 24 P. 1083, 11 L. R. A. 65, and notes; Fuller v. Supreme Council, etc. [64 Ind. App. 49], 115 N. E. 372-376."

Again, in the case of Mutual Life Ins. Co. of New York v. Sargent (C. C. A.), reported in 51 F. (2d) 4, the court said at page 6:

"It is also true, however, that where there are facts and circumstances or the testimony of witnesses which furnish contradiction, or where, as here, the testimony cannot be controverted because it relates to statements by or transactions with a decedent, whose lips are sealed by death, it is for the jury to judge the truth of the testimony, and to say whether the statements attributed to the deceased were in fact made by him. Aetna Life Ins. Co. v. Gallaway (C. C. A.) 45 F. (2d) 391; Casualty Reciprocal Ex. v. Parker (Tex. Com. App.) 12 S. W. (2d) 536; Smith v. Mutual Life Ins. Co. (C. C. A.) 31 F. (2d) 280; note, Kelly v. Jones, A. L. R. 792."

Thus we are confronted with a case where the testimony of the insurance company cannot be controverted because the unfortunate individual who took this policy has passed on and his lips are sealed forever. Here we have a case which seems to me to be one that comes under the rule laid down in the cases above cited. The insurance company occupied a superior position. It sent its trained expert, a lawyer, to the hospital room of this insured, where this representative found the insured in bed, in a dying condition, several hundred miles from home, without any one with whom to advise or consult. The insurance company's attorney told this insured—who was physically in a weakened condition and due to the disease from which he was suffering, an advanced case of tubercu-

losis, mentally disturbed—that if he did not compromise and settle this case, the insurance company would hire the best lawyers available, Wade & Dutcher, and commence a court action to cancel the policy. The threat was a court action, to a man in a dying condition. It is a well-known fact that the threat of a court action scares a great many people, and when you couple that with the physical condition of the man at the time, and add to that the fact that the insurance company was settling a liability of $2,000 for the sum of $275, it seems to me that these facts are sufficient to show unfair dealing; that a prima facie case of fraud has been made out; and that it was a question for the jury to decide whether or not there had been fraud used in the securing of this compromise and settlement. It must also be noted that the insurance company, in addition to the signing of the compromise and settlement agreement, insisted on the insured signing a change of beneficiary, changing the beneficiary from his wife to that of his estate. At no time did the insurance company make any effort to secure the insurance policy which it had issued to the insured and which was at the insured's home in northwestern Iowa. Why the company did not attempt to secure the policy does not appear in the record, but if it had attempted to secure the policy it would, of course, have been necessary to inform the relatives of this unfortunate individual that the company was canceling the policy.

The insurance company in this case is not injured; it can raise its defense of fraud in the securing of the policy, if it has one. And, if the insured was guilty of fraud in the securing of the policy, then the company will not be forced to pay the amount due on this policy. The circumstances covering this settlement, in view of the fact that there is no way that the insured's beneficiary can refute what took place in that hospital room, raise a question of unfair dealing, of fraud, which makes out a prima facie case for a jury to decide. This case has been submitted to a jury, and the jury upon the evidence found for the appellee.

I would affirm the decision of the lower court.