ORAL M. COLVER, Appellee, v. CONTINENTAL ASSURANCE COMPANY, Appellant.

No. 43137.

OCTOBER 15, 1935.

R. C. d'Autremont, and Mabry & Mabry, for appellant.

H. V. Levis and George C. Stuart, for appellee.

MITCHELL, J.—Lester H. Colver made written application

to the Continental Assurance Company for a policy of insurance in the amount of $2,000 upon his life. On the 20th day of September, 1933, he appeared before Dr. A. L. Yocom, Jr., the medical examiner of the appellant company at Chariton, Iowa, and submitted to a medical examination as to his health and insurability. The medical examiner made a certificate of health to the insurance company, and as a result thereof, on the 2d day of October, 1933, the policy now in question was issued, naming Oral M. Colver, the wife of the insured, as beneficiary. On the 12th day of December, 1933, the insured died at Afton, Iowa. Formal proof of claim was filed by the beneficiary, as required. The company then made an investigation and discovered that Lester Colver on the 19th day of August, 1933, had consulted Dr. Delmar B. Sollis, an eye specialist, in Chariton, Iowa, and had given him a history of having suffered from diplopia or double vision. Investigation further disclosed that the insured had complained of a tired, overworked feeling during July and August of 1933. The insurance company then instructed one of their adjusters, Mr. Ladd Shramek, to call on Mrs. Colver and to explain to her that the company had certain defenses against the claim filed by her and that it felt, by reason of the false and fraudulent representations and concealment made by the insured concerning his health, it owed her nothing on the policy. In compliance with his employer's instructions, Mr. Shramek did call on the beneficiary on February 16, 1934. He called early in the afternoon, and as Mrs. Colver was sick in bed and unable to see him he came back about 4:30, when her thirteen year old daughter, who was attending school, had returned home. Mr. Shramek was a man of experience in the settlement of cases; that was his business. He told Mrs. Colver that her husband had secured the policy by making false statements and that the insurance company was not liable, but that it would pay her what it would cost the company to defend a lawsuit if she brought one, $200. He then secured her signature to a release, gave her a check in the amount of $200, and took the policy with him. Later Mrs. Colver tendered the $200 which the company had paid her and demanded the full face value of the policy in the amount of $2,000. The insurance company refused to pay, and she was forced to commence suit. The appellant company set up two defenses: First, that the policy was procured by fraud; second, that a compromise settlement was made by ap-

pellee when she executed her release to the appellant's agent and surrendered the policy on the payment of the sum of $200. The appellee in reply denied the first defense and set up that the written release was obtained by fraud and misrepresentation and was without consideration, and asked that she recover the balance due under the insurance contract in the amount of $1,800. The case was submitted to a jury, which returned a verdict in favor of Mrs. Colver. The insurance company has appealed to this court.

The appellant relies mainly upon two propositions for reversal of this case: first, that Lester H. Colver made false and fraudulent answers to the insurance company's medical examiner, and by fraud obtained from such medical examiner a certificate of sound health and insurability, and the issuance of the policy of insurance sued upon.

■■■ The false statements which appellant complains of that were made to the examining physician, were: first, in response to the question, "Have you ever had or been told that you had fits, nervous breakdown, overwork, or any other nervous or mental disorder?" he answered, "No," and, second, to the question, "What physicians did you consult in the past ten years? Name all, state why?" he answered, "None." The insurance company claims that 'because Lester Colver consulted an eye specialist, who diagnosed his trouble simply as a defect in his eyesight and prescribed eye glasses for him; and that because Lester Colver consulted Dr. Gutch of Chariton some two or three months preceding and was given a tonic, these answers were false and made with the intent of deceiving Dr. Yocom into issuing a certificate of health.

It is the statutory law of Iowa, section 8770, Code of 1931, that the certificate of health given by a company's medical examiner is conclusive and the company is estopped to attack the insurability of applicant unless the certificate be secured by fraud and deceit.

In the case of Sargent v. Modern Brotherhood, reported in 148 Iowa 600, on page 607, 127 N. W. 52, 55, this court said:

"But in the interpretation of the language used in calling for answers and in making response to such inquiries, the courts insist upon a reasonable or even a liberal construction in favor of the assured, with a view to avoiding forfeitures on purely

technical grounds. As is said in the case of Wilkinson v. Connecticut Mutual L. Ins. Co., 30 Iowa 119, 127, 6 Am. Rep. 657, relating to the failure to disclose in answer to a question about previous accidental injuries a slight injury which the jury specifically found not to be serious: 'The language of the question is to have a reasonable construction in view of the purposes for which the question was asked. It must have reference to such an accidental injury as probably would or might possibly have influenced subsequent health or longevity of the insured. It could not refer, and could not be understood by any person reading the question for a personal answer to refer, to a small burn upon the hand or arm during infancy, to a cut upon the thumb or finger in youth, to a stumble or falling or sprain of a *joint in more advanced age*. The idea is that such a construction is to be put by the courts upon the language as an ordinary person of common understanding would put upon it, when addressed to him for answer.' * * *

"Thus, it has been held that a statement that the applicant is in good health is not shown to be false by proof of a temporary ailment, not indicating a vice in the constitution or so serious as to have some bearing on the general health and continuance of health; that is, such as according to common understanding, would be called a disease. * * *

"Even where the inquiry is as to a specific ailment or disease it is to be interpreted as calling for an answer only where the previous attack was of a nature likely to result in impairment of health or to indicate a constitutional difficulty which might shorten life. * * * Accordingly, this court had held a negative answer as to 'spitting or coughing of blood' was not false, unless the evidence showed that the applicant had been subject to spitting or coughing of blood in such sense as that a reasonable person might suppose some ill health or physical condition, affecting the desirability of the applicant as a risk, was indicated. * * *

"Giving to the questions and answers in this case relating to previous disease or severe sickness the interpretation thus indicated, it is clear that the evidence did not show any falsity in the statements. The tonsilitis or quinsy was not of a character to be denominated a disease, and the stomach trouble appears to have been of a similarly inconsequential character. Headaches due to temporary causes, not indicating or resulting in constitu-

tional impairment, are not regarded as matters of enough conse-
quence to be disclosed even where there is a specific question as
to habitual headaches. * * *

"The same principle is to be applied in construing ques-
tions and answers relating to prior attendance by a physician.
In response to such question it is not necessary for the appli-
cant to disclose the occasion and circumstances of every consulta-
tion of a physician for temporary disability or indisposition, not
amounting to a disease."

In this statement of the law we concur. To hold otherwise
would no doubt unjustly deprive many of the right to recover
upon insurance policies, who through failure of memory or be-
cause of what to them seemed a trivial call upon a doctor failed
to disclose some consultation with a doctor for a temporary dis-
ability or indisposition, or for some minor ailment. The untrue
answer does not necessarily prove fraud; there still remains the
question for the jury to consider whether or not there was an
attempt to deceive the insurance company. In the case at bar
Lester H. Colver did not seek this insurance. The agent of the
insurance company called upon him several times urging him to
take the policy. Finally he signed the application. He did not
rush to the doctor's office to take the physical examination; the
record shows he was called twice before he went. He was work-
ing steadily and at hard labor, all during this time, and ap-
peared to be in the best of health. He had told the agent of the
insurance company who had solicited the policy about the fact
that Dr. Sollis had fitted him with a pair of eye glasses and that
Dr. Gutch had given him a tonic. The record does show that he
went to Dr. Sollis, an eye specialist, and that the doctor thought
his trouble would be cured by fitting him with a pair of eye
glasses. There is nothing in the evidence of Dr. Sollis that would
convince any reasonable man that Lester H. Colver had any-
thing the matter with him except that he needed glasses. Colver
did go to Dr. Gutch some months before for a trivial ailment.
Certainly there is nothing in this record to show that Lester H.
Colver had any idea from his consultations with Dr. Sollis and
Dr. Gutch that there was anything fundamentally wrong with
him; that he had any disease. He submitted himself to the
examination of the insurance company's doctor. He made no
effort to conceal anything from the company, as he had told their

agent, the man who solicited the policy, that he had consulted both Dr. Sollis and Dr. Gutch and what they had advised him.

In view of the law, the presumption of the statute, and all the facts surrounding the issuance of this policy; in view of the further fact that the burden of proof of this defense was upon the appellant; in view of the fact that they seek to prove fraud by one witness only; in view of the fact that the credibility of the witness was for the jury, the lower court was right in submitting the case to the jury for its determination.

The appellant in regard to the second question raised says:

"No principle of law is more definitely or more universally settled than that a compromise settlement of a good faith controversy between two or more parties is encouraged by the law, and when made without any fraud or artifice on either side, is universally upheld by the courts, not only in our own jurisdiction, but in every jurisdiction. Such a principle rests upon the soundest public policy and is conducive to peace, amity and good order among men."

■■■ With this statement we agree. When settlements are fairly arrived at between parties, such agreements should be respected and enforced by the court. It is the policy of courts also to encourage the amicable settlements of all controversies, but, as said by this court, "it is even more a matter of good policy and good morals to stamp the law's disapproval upon settlements which bear the taint of fraud and undue advantage."

Let us look at the situation in this case. The insurance company, about a month after the death of the insured, sent its trained expert, a man who for more than twenty years had been engaged in the business of an insurance adjuster, to the home of Mrs. Lester Colver. She was a lady of little education and of no business experience. On the day that Mr. Shramek, the adjuster, arrived, she was confined to her bed. Somehow or other he talked to her through the window. Just how this occurred we do not know. He sought admission to the house and she said she was sick; there was no one there and she could not see him. She informed him then that her daughter, thirteen years of age, was at school, and would be back around four o'clock. He said he would return, and he did. Mrs. Colver was still in bed. The thirteen year old girl was the only other

person present. The adjuster told Mrs. Colver that her husband had taken the policy out under false pretenses and that therefore made the policy no good. This statement, that her husband had tried to defraud the company, affected Mrs. Colver greatly and caused her to cry and to reply that ''Lester didn't take that policy to defraud,'' and that he had dropped another insurance policy at about the same time. The insurance adjuster then replied, ''Of course the company knows that your husband didn't intend to defraud the company.'' After considerable argument back and forth between this trained expert, representing the insurance company, and the widow, confined to her bed, with no one with whom to advise or consult, Mrs. Colver signed a release, settling the $2,000 claim against the company for the sum of $200. It is her claim, and there is evidence to bear it out; that the adjuster represented to her that this policy of insurance was not good and she could not recover anything under it because of false representations made to Dr. Yocom. And yet we find this same adjuster admitting that his company did not believe that Lester Colver intended to defraud the company when he made answer to the questions of Dr. Yocom. And, knowing that Lester Colver did not intend to defraud the company, this adjuster knew that the company had no defense to this policy, and when he told Mrs. Colver that the statements which Lester Colver made rendered the policy no good and she would get nothing unless she settled, he told her facts which he knew, or is charged with knowing, to be false. It will not do for him to say that it was merely his opinion of the law, as he holds himself out as one who is skilled in the law of insurance, and, as Mrs. Colver put it, she thought he ought to know the law.

This court in the case of Rauen v. Insurance Company, 129 Iowa 725, at page 738, 106 N. W. 198, 203, said:

''But there was here more than a mistake. There was a surrender of legal rights intentionally induced and procured by a false representation as to the law governing the case. The defendant must be presumed to have known that it was liable for the whole loss, and by falsely representing that under the law applicable to the case the policy was void it induced plaintiff to rely upon the superior knowledge that it possessed upon the subject and to surrender to it his claim. This clearly con-

stituted fraud, and there would be manifest injustice in upholding a settlement under such circumstances.''

In the case of Robinson v. Meek, reported in 203 Iowa 185, 210 N. W. 762, we find a case where an illiterate colored man was severely injured, and. within a few days after.he was taken to the hospital with a broken leg and other injuries and confined to his bed an insurance adjuster went to see him. This court, speaking through Justice Evans, said at page 188:

''The conversation, in the first instance, was the casual conversation of visitors. The plaintiff was suffering great pain. His leg was in a splint and was held in an elevated position from which a weight was suspended over a pulley. His head had been injured, and he was suffering from great headache and from roaring in his head. Sleeping tablets had been administered to him and a 'shot in the arm.' This was his physical condition. He had no one present to advise or assist him. He had no warning that he would need any advice or assistance. The conversation was one sided. The defendant assured him that his expenses would all be cared for. He appears to have been appreciative of defendant's solicitude. The record discloses that the plaintiff assented to everything that was said or proposed to him. After making the representations testified to, the agent said to him: 'I will give you $125. Will that be all right?' The plaintiff answered: 'I guess so.' The agent immediately wrote out the contract of settlement. When he found the plaintiff could not read it because of his condition, he read it to him.'' On page 190: ''The helpless condition of the plaintiff was pleaded in the reply, as an incident of the fraud. Without holding that the mere representations herein set forth were, of themselves, sufficient to impeach this settlement, if they had been made under different circumstances from those indicated herein, we reach the conclusion that the question of fraud and fraudulent representations, in the light of plaintiff's then physical and mental condition and capacity, was fairly one for the jury. In Kilmartin v. Chicago, B. & Q. R. Co., 137 Iowa 64, 70, 71, 114 N. W. 522, 525, wherein we sustained the settlement, we said:

'' 'Settlements made with an injured party by a claim agent of a railroad, who is rushed to the scene, and who deals with the injured person before he has had time to realize what he has

suffered, or is likely to suffer, and without opportunity for consultation, may well be looked upon with suspicion.' "

So in the case at bar Mrs. Colver was certainly in a helpless condition. Her husband had died but a month before. She was alone at home, confined to her bed. She had no one to advise or assist her, for the only person present was her thirteen year old daughter, who had just returned from school. The insurance adjuster knew these things and yet he went into that sick room, confronted this woman of no business experience in her weakened condition, and secured a settlement of a $2,000 obligation for the sum of only $200. We think that, in the words of Judge Evans in the case just cited, such settlement "may well be looked upon with suspicion." Certainly, in view of the circumstances under which this compromise settlement was made, the question of fraud and fraudulent representations, in the light of appellee's then physical and mental condition, was fairly one for the jury.

But the appellant says that the case of Vande Stouwe v. Bankers' Life Company, reported in 218 Iowa 1182, 254 N. W. 790, is a case involving almost identical features with the case at bar. The writer of this opinion did not agree with the majority in that case, and his views are set out in a dissenting opinion. No good could be accomplished by repeating them here. The Vande Stouwe case is distinguishable from the case at bar for the reason that Vande Stouwe was alive, representations were made to him, and he knew whether or not he had made false statements or intended to defraud the company in procuring the policy or to deceive the examining physician into issuing a certificate of health. When the attorney representing the insurance company in that case told him of the facts which he had discovered, Vande Stouwe knew whether or not these facts were true, while in the case at bar the adjuster was not talking with Lester H. Colver but with his widow, and she did not know whether the statements that the adjuster made to her that her husband had made false statements to Dr. Yocom were true or not. In the Vande Stouwe case, Vande Stouwe knew whether the statements were true, while in the case at bar Mrs. Colver was forced to rely entirely on the statements of the adjuster.

Other questions are raised, all of which have been given

416

careful consideration. The record clearly shows that this was a question for the jury to decide, and it was properly submitted by the court.

Judgment and decree of the lower court must be, and it is hereby, affirmed.

KINTZINGER, C. J., and ANDERSON, DONEGAN, HAMILTON, and POWERS, JJ., concur.